## STATE, USE OF LANDIS *v.* THE BALTIMORE AND OHIO RAILROAD COMPANY

[No. 36, October Term, 1950.]

460

*Decided December 7, 1950.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*James Alfred Avirett,* with whom were *W. Earl Cobey* and *John Wagaman* on the brief, for the appellant.

*William A. Gunter* and *E. Stuart Bushong,* with whom were *D. Lindley Sloan* and *Irvine H. Rutledge* on the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a judgment for the defendant, entered after the court directed a verdict for the defendant, in a case involving the death of a pedestrian at a railroad grade crossing in Cumberland. The scene of the accident was the Harrison Street crossing, the second crossing east of Baltimore Street. The street runs north and south and is 51 feet wide, paved but traversed by nine sets of tracks, which are 150 feet across. Counting from the north, tracks numbers 1, 2 and 3 are for passenger trains, number 4 is an eastbound freight track, numbers 5, 6 and 7 are yard tracks, and numbers 8 and 9 are sidetracks.

At about 6:20 P. M. on November 23, 1945 the decedent Landis, 69 years of age, approached the crossing from the north on the easterly side, on the way from his home to the business section. He used the crossing daily and was thoroughly familiar with it. It was a dark and windy night. There was a watchman, Vandergrift, standing facing south between tracks numbers 2 and 3 in the center, holding up a red lantern. There was an engine with its tender standing on track number 4 about 12 feet to the east of the easterly side of the crossing. A brakeman, named George, was standing on the easterly edge of the crossing in front of this engine on track number 4. There was a backing freight train approaching the crossing from the east on track number 6 at a speed of 4 or 5 miles per hour. This train was over 1,000 feet in length composed of 24 freight cars with a caboose on the end; the switching operation in which it was engaged occurred daily at about this same time. The track bends sharply to the south just to the east of the crossing, so that the engineer had no view of the crossing. A flagman, Hoyle, was stationed at the crossing with red and white lanterns. With the former it was his duty to warn traffic; the latter was used to give stop, or emergency stop, signals. Because of the great length of the train, the conductor was stationed on a box car to the east on track number 7.

He in turn relayed stop signals to the brakeman, who in turn signalled the engineer. Hoyle was in the center of the crossing between tracks numbers 7 and 8 facing north, holding up his red lantern.

Landis paid no attention to the warning signals. He proceeded south on the easterly side of the crossing until he reached a point on track number 4, about 40 feet from Hoyle, where he began to run across in front of the approaching caboose. Hoyle yelled to him "Hey, Stop" and "Look out." Landis did not stop, but continued to run forward, diagonally across to the southwest, in front of the backing caboose. He was struck by the northerly side of the rear of the caboose about the center of the crossing, and knocked down. Before the train was stopped the northerly wheels of the caboose and the wheels of two and one-half of the freight cars passed over him. His body was lying from 3 to 10 feet from the westerly edge of the crossing after the train stopped, with the rear of the caboose about 130 feet west of his body.

Hoyle testified that when he saw the decedent running in front of the caboose he immediately gave the emergency stop signal with his white lantern. He was asked why he did not climb on the caboose and apply the emergency brake there. His reply was that he "figured I could get him stopped quicker by a hand signal." As a matter of fact, it appears that the train was stopped by the action of the brakeman, George, rather than by the engineer. When George heard Hoyle yelling to the decedent, and saw the latter run past him, he tried to grab him; his glove touched his clothing. George was about 30 feet from the center of track number 6 at that time. Failing to catch the decedent, George ran between the freight cars and broke the air-hose. This brought the train to a stop in 3 or 4 feet.

The appellant earnestly contends that the railroad company was negligent in backing the train over a public crossing without having any member of the train crew stationed on the caboose, in a position to apply the emer-

gency brake and to sound the whistle located on the rear platform. Stress was also laid upon the failure to light the crossing adequately. But if we assume primary negligence on the part of the defendant, we think the evidence of contributory negligence is so clear as to present no issue for the jury. It is undisputed that the decedent not only disregarded the warnings of the red lanterns, but was given a shouted warning to stop at a time when he was in a place of safety, 30 feet from the track. Instead of heeding it, he ran headlong in a diagonal direction, in front of the backing train. The facts are strikingly similar to those of *State for use of McLucas v. Western Maryland Ry. Co.*, 190 Md. 25, 29, 57 A. 2d 283, 284. We said in that case: "Had he stood still, the car would have passed in front of him, at a distance estimated at from seventeen to twenty feet from him. Instead he ran forward. A rational conclusion would be that he tried to run ahead of the car, and miscalculated. Whether that is true or not, he went from a place of safety into the danger zone, and the resulting unfortunate happening was of his own making."

The appellant contends, however, that the case should have been allowed to go to the jury on the theory of last clear chance, citing *Baltimore & O. R. R. Co. v. Leasure*, 193 Md. 523, 69 A. 2d 248. In that case, where a pedestrian was struck by the tender of a backing engine at the Baltimore Street crossing in Cumberland, it was shown that the plaintiff, after he was struck and fell 10 feet from the easterly edge of the crossing, was pushed a distance of about 47 feet. The wheels did not strike his leg until he had been pushed by the tender step to the extreme western edge of the crossing and the testimony was clear that the train could have been stopped in the interval. The train stopped in about 12 feet after the watchman yelled to the fireman to stop. But the watchman did not observe the plaintiff's position of helpless peril until the rear of the tender was within 6 feet of the westerly side of the crossing. He sought to excuse his failure by the fact that he had left his post

to warn other pedestrians. We said, 193 Md. at page 535, 69 A. 2d at page 253, "We think the jury might properly find, in view of the time lag, that the watchman failed to exercise proper vigilance under the circumstances, and to utilize his then existing ability to stop the train."

In the instant case, there is no evidence that the train could have been stopped in time to avoid the fatal injury. If the defendant was negligent in failing to have a train-man on the caboose, such negligence was concurrent with the plaintiff's negligence and not sequential. There was no evidence of a time lag, during which the injury could have been averted. The evidence does not show at what point the decedent met his death, but the testimony is uncontradicted that he was decapitated, and that the wheels of the caboose and two and one-half other freight cars passed over his body and moved a distance of 130 feet beyond it. The witness, Trout, testified that he saw the body rolling in front of the caboose, but the distance between the initial point of impact and the spot where the body was removed was not more than 15 or 20 feet. At 4 miles an hour, the train would move 20 feet in about 3 seconds. There was no evidence that the decedent was pushed by the caboose, or that the train could have been stopped before its wheels passed over him. The prompt and courageous action of the brakeman, George, in going between the moving cars and breaking the air hose, was unavailing. Whether the flagman, Hoyle, could have stopped the train sooner, by mounting the moving caboose and turning the angle cock below and to the rear of the platform near the coupler, is a matter of pure speculation.

Time and a reasonable opportunity to avoid harming a plaintiff who has placed himself in a position of help-less peril, by utilizing a "then existing ability", is an essential element of the doctrine of last clear chance. *Congressional Country Club v. B. & O. R. Co.*, 194 Md. 533, 545, 71 A. 2d 696, 700; *Baltimore & Ohio R. R. Co. v. Leasure, supra; State for use of McLucas v. Western Maryland R. R. Co., supra; Legum v. State, for use of*

*Morna*, 167 Md. 339, 173 A. 565; *State to use of Kolish v. Washington B. & A, Electric R. Co.*, 149 Md. 443, 131 A. 822; Restatement, Torts, §§ 479, 480. We find no basis for the application of the doctrine in the instant case.

*Judgment affirmed, with costs.*