STATE, Use of FRIZZELL, et al. *v.* GOSNELL et al.
(Two Appeals in One Record)

[No. 110, October Term, 1950.]

382

*Decided March 16, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Ralph G. Hoffman* with whom was *Walter R. Haile* on the brief, for the appellants.

*Talbot W. Banks,* with whom were *Theodore F. Brown* and *Clark, Thomsen & Smith* on the brief, for Carroll R. Gosnell.

*Wylie L. Ritchey,* with whom was *John Wood* on the brief, for Edward Cook.

GRASON, J., delivered the opinion of the Court.

On September 3, 1949, at about 7:45 or 8:00 P. M., William B. Frizzell was driving his 1937 Plymouth sedan north on Gamber Road (Route No. 91) an unfavored highway. With him at the time were George Bosse, on the front seat, John Robert Grego, who was directly behind him in the rear seat, and sitting next to Grego was George Koermer. They came to U. S. Route No. 140, which was a duly marked and established boulevard

or arterial highway. While attempting to cross the boulevard a collision occurred, in which Frizzell and Bosse were killed.

Suits were instituted in the Circuit Court for Carroll County, one by the State of Maryland to the use of Frizzell's widow and child, and the other by Frizzell's administrator, against the defendants Gosnell and Cook. They were tried together in the Circuit Court for Carroll County, before a jury, and the court, at the conclusion of the plaintiffs' testimony in each case, directed a verdict for the defendants, and from judgments for costs entered thereon, the cases come here on appeal. This requires a review of the testimony, and if there is any evidence, however slight, legally sufficient as tending to prove negligence, the weight and value of such evidence should have been submitted to the jury; and the court, in deciding this question, must resolve all conflict in the evidence in favor of the plaintiffs, and assume the truth of all evidence and such inferences as may naturally and legitimately be deduced therefrom which tend to support the plaintiffs' right to recover. *Valench v. Belle Isle Cab Co.*, 196 Md. 118, 75 A. 2d 97.

The facts in these cases are the same, and may be summarized as follows: U. S. Route No. 140 was recently improved for a distance of three and two-tenths miles. Two miles thereof is in Baltimore County and a mile and two-tenths is in Carroll County. The improvement includes the bridge which spans the North Branch of the Patapsco River, which divides Baltimore and Carroll Counties. It by-passes the village of Finksburg, in Carroll County. As one travels westward on this road, towards Finksburg, the old road, which goes through Finksburg, intersects the boulevard to the left.

On the evening in question there is testimony that two cars came down a hill on the Baltimore County side and as they approached the bridge one passed the other, and going up a hill on the Carroll County side, the car in the rear passed the one in front and they rounded a curve and disappeared from the sight of these

witnesses, who were a man and his wife who were out for an evening drive. They said that the cars were traveling fast and were racing. Neither identified the driver of either car, nor the license number of either car. They came to the scene of the accident and identified the car which turned out to be the car of the defendant Gosnell, as one of the cars which was engaged in the racing. There was another witness, who saw these cars but could not identify the driver of either, and did not get the number of the license plates on either car, who stated that the cars were racing.

Mrs. Brummel, whose testimony will be hereafter referred to, stated that the cars were "flying", but she did not attempt to estimate the speed of the cars, nor did she get the numbers of their license plates.

Trooper Hollie, of the State Police, was at Reisterstown when he heard of the accident. He arrived on the scene at 8:16 P.M. "When I arrived at the accident, I observed a 1949 Studebaker Sedan in the westbound lane of traffic, the right westbound lane, headed in the direction of Westminster. Down off Routh 140, down in the yard of the private home, (Martin home) down an embankment there was a Plymouth Sedan turned over on its left side up against the house." He saw the two dead men. He found "some debris in the road and a little mud that apparently came off of one of the cars, and there was a small scuff mark that had been made by a tire, apparently by a tire, and there were some scratches on the road that had been made apparently by some metal or part of the car. (He saw no skid marks.) * * * that is what we determined was the point of impact. * * * Well, as near as I could determine, the impact occurred just about on the yellow line which divides the two westbound lanes of traffic. That is, the two lanes headed in the direction of Westminster, which would be on the north side of the highway." He stated that the Frizzell car traveled about eighty-four feet from the point of impact until it came to rest on its side, a part of which was against the Martin house.

On cross examination he marked on a photograph, "Defendants' Exhibit B", the letter "A" to show where he thought the collision occurred. He was asked the question: "Q. Then, that was to the right of the center line that went across towards Cedarhurst? A. That is right." He saw a car standing at the scene of the accident, (this car was referred to as the Gosnell car) and he pointed out on a photograph where it was, and said it was standing "fifty feet from the point of impact". He was further asked, on cross examination: "As I understand your testimony in chief, the impact was practically on the dividing line between the two westbound lanes; is that right? A. That is right. Q. Then according to that, the Frizzell car must have come on to that road and crossed the two eastbound traffic lanes and had practically crossed the first lane of the westbound traffic; is that right? A. That is right."

Traveling north on Gamber Road, which is an unfavored highway about sixteen feet wide, and coming to the intersection in question, there is the usual sign at the southeast corner, which appears plainly and contains the word "Stop"; and painted on the Gamber Road, at the intersection, is the word "Stop". For some little distance on Gamber Road (in the middle thereof) and extending up to the intersection itself, is a pronounced marker consisting of two white lines, and in the center thereof is a dark line, and there is an apron extending from Gamber Road, which circles around the southeast corner and connects with the boulevard. From this point one can see easterly for two-tenths of a mile to a curve in the boulevard, which clearly appears from the photograph "Defendants' Exhibit B". At the northwest corner is an embankment eight feet deep. At the bottom of this embankment is a house which belongs to the State Roads Commission and was occupied at this time by a man by the name of Martin, and his family.

The boulevard is fifty feet wide. In the center there are two white lines painted in the middle of a black substance, which separates the east and west bound traffic.

The part of the boulevard to the north of these white lines is divided into two lanes which are separated by a yellow line; and the south side of the highway has two lanes which are likewise separated by a yellow line, as appears by "Defendants' Exhibit C". Traffic at this intersection is not controlled by automatic lights, or by a police officer.

Trooper Hollie further said that he first saw Gosnell at his home about two weeks after the accident, after he had returned from the hospital. He testified, over objection, that Gosnell told him, while in his home, that he was traveling about fifty miles an hour, but that when he left the house to go to his car Gosnell followed and there told him that he was traveling at a faster speed than fifty miles an hour at the time of the collision, and Hollie asked him if it could have been sixty miles an hour, and finally Gosnell said he could have been traveling at a speed of eighty miles an hour. It is curious to note that the condition of Gosnell's car after the accident is not described in the testimony. The only reference to it is that it was standing on the side of the road, about fifty feet from the point of impact.

The witness Mrs. Edna Brummel was standing at the rear of her property, on the south side of the boulevard. Her lot fronts on the old Finksburg Road. She was burning trash. She heard a noise and looked up toward Reisterstown. She saw a light colored car traveling in the north lane, westbound; then she saw a second car which was about a length and a half of the court room in the courthouse at Westminster behind the first car, and traveling in the inner west bound lane. She described the speed of the cars as "flying". From the intersection, easterly, there is a church property, and about one hundred and fifty feet from the intersection there is a dirt road that goes through the church property to the old Finksburg Road. Mrs. Brummel was standing about four hundred feet from the intersection. When the cars passed where she was standing she looked towards the intersection. At that time the Frizzell car

was moving out of Gamber Road to the boulevard. It was traveling slowly and steadily. "I thought what in the world is he pulling out in front of that car. I thought he was far enough over in that lane of traffic, that he was going steady and that he wasn't going to stop." She testified that the car following the Studebaker made an "S" turn before it reached the Frizzell car and completely turned around and proceeded easterly and turned into the church road. After the impact the red lights on the Studebaker were still burning, and the lights on the car that made this "S" turn were turned off when it entered the church lane and then turned on again, and the car disappeared. She could not identify the driver of that car, nor was she able to get the number of his license plates. After telling of the approach of the cars to where she was standing, she testified: "I followed him up and just about the time that he got to the cemetery, the first lane that goes into the cemetery, I glanced and saw this other car, it was just like it was on this lane right ahead of him, and I think it had pulled out of the Cedarhurst Road and it was clear across the road, and this fellow just when he struck his car just stopped just like a monument, it didn't move, and I saw dust fly as high as his car. There were no machines hardly on the road at all. This other car then came up back of him and he turned real quick, took the whole width of the road to turn over towards the church property and then I think, well, when he comes down I will get his number, but somehow he went in the church road there to his left, he was started then, and this other car turned around and started towards Reisterstown. I thought I would get his license number when he passed, but quickly he turned in the church yard like someone that was familiar with it, but he took the whole road to turn and he made an 'S' turn."

The witness Grego, who was riding in the rear seat directly behind Frizzell, gave this account of the accident: "I am not too familiar with the road, but I know we were coming out of the Cedarhurst Road going to

the store, wherever the store was, I don't know. He said he was going to the store, so when we approached this highway, he stopped long enough to look up both sides of the highway to see if anything was coming. Then, he started over at a low rate of speed, and I could see a car coming down by the curve on that little incline, just when this car was coming around the curve and started up that incline. We thought we had plenty of time to get across, and he started across, and that is all I remember. It looked to me like we were three-quarters of the way over already." He said he saw two cars. He was shown the photograph, "Defendants' Exhibit B", and stated the cars were coming around that curve, just about getting around the curve and starting on the incline. He was asked if he remembered which way he looked last, and he said: "No, it wouldn't make much difference, we all looked up both ways." But there is no evidence in the case that Frizzell or Grego looked more than once, and that was before they proceeded to cross the boulevard. He did not say anything to Mr. Frizzell because the oncoming cars, he said, "looked like they were so far away it didn't seem like it was necessary". He said that Frizzell stopped and started from low gear and he traveled slowly and it "looked like he had plenty of time". The car that Frizzell was driving, he thought, was a 1936 Plymouth. "Q. Now, do you know what happened to the other car? A. He got along, but I know there was a car alongside of me. I know the car that hit us had bright lights, I do remember that, but the other car it had sort of light reflectors that would be in an old car, they would be tarnished and they wouldn't have set up a strong beam, I do know that. I know it was two cars." He further said on cross examination that he did not know whether Mr. Frizzell saw the car, but that he had testified before the magistrate: "I seen two headlights coming up, in fact, I seen four of them coming up."

"Q. Then, I will ask you, where was this car when Mr. Frizzell pulled in on to the westbound lane? A. I

couldn't tell you that. We had plenty of time, it was my idea that we could have gone there and back again.

"Q. Can you tell the Court and jury where the other car was when Mr. Frizzell pulled on to the westbound lane of traffic? A. We were down in the whole highway altogether.

"Q. I am asking you where the other car was when Mr. Frizzell pulled out from the eastbound lanes into the westbound lanes? A. Westbound is going into Westminster? A. Yes. A. We were down in there.

"Q. I am not talking about where you were, I am asking you where the other car was, the car of Mr. Gosnell, at the time when Mr. Frizzell pulled out of the eastbound highway into the westbound highway? A. I couldn't tell you. I guess it was on top of us then."

The appellants contend that the direct and proximate cause of the accident was that the appellees were racing, and that the case should have been submitted to the jury, along with the question of contributory negligence on the part of Frizzell in the operation of his car; while the appellees urge that the direct and proximate cause of the accident was the negligence of Frizzell, and if not the direct and proximate cause of the accident, then Frizzell's negligence directly contributed to the accident, and the cases were properly withdrawn from the jury. We point out the undisputed fact that the boulevard is a favored highway and was set up as such by the State Roads Commission under section 138 of Article 66½, 1947 Supplement to the Code, and that drivers of automobiles entering a favored highway from an unfavored highway are controlled by section 178 of Article 66½ of said Supplement. We have held where the operator of a vehicle enters a "stop" or "boulevard" street, that is, a street on which all through traffic has the right of way, in disregard of the rules of the road as established by statute, and collides with a vehicle approaching on such through street, the collision can only be attributed to his negligence. *Blinder v. Monaghan,* 171 Md. 77, 188 A. 31, *Madge v. Fabrizio,* 179 Md. 517, 20 A. 2d 172,

and in the latter case we said one driving on a favored boulevard has a right to assume that those entering thereon will comply with the statute in regard thereto.

In *Greenfeld v. Hook,* 177 Md. 116, 8 A. 2d 888, 136 A. L. R. 1485, the court found that the facts of the case permitted the application of the doctrine of "last clear chance". This case is relied upon by the appellants. In the opinion in that case, 177 Md. at page 132, 8 A. 2d at page 895, Judge Offutt said: "Without further comment, it is the opinion of this court that so much of Code (Supp. 1935), Art. 56, sec. 209, as applies to the facts of this case, is mandatory, that it is the positive and imperative duty of a person driving an automobile over an unfavored highway, when he approaches an intersecting highway lawfully designated as a 'boulevard' or 'stop street', to stop before entering the intersection, and having stopped, to exercise reasonable care and diligence to discover whether traffic thereon is approaching the intersection, and, having entered the intersection, to yield the right of way to such traffic, by permitting it to proceed without interruption, and that that duty persists throughout his passage across the favored way."

Without further quoting from our decisions, it is sufficient to refer to *Shedlock v. Marshall,* 186 Md. 218, 46 A. 2d 349, where, in an opinion by Chief Judge Marbury, all of our previous cases are fully reviewed, and that case controls the decision in this case. *Belle Isle Cab Co. v. Pruitt,* 187 Md. 174, 49 A. 2d 537; *Baltimore Transit Co. v. O'Donovan,* 197 Md. 274, 78 A. 2d 647. The appellants have relied on in their brief a number of out of state cases, but we must be controlled by our own decisions.

Assuming, without deciding, that the testimony warrants a finding that the appellees' cars were traveling at an unlawful rate of speed, and were racing, nevertheless, Frizzell was without right to violate the law in traveling across the boulevard.

There is no testimony in the case that connects Cook with the accident. Trooper Hollie was called in chief

by the appellants and testified to statements made to him by Gosnell and Cook.  He stated Cook told him that he was on the boulevard the evening of the accident but he turned off to enter the old road into the village of Finksburg, and that he was not at the scene of the accident that evening and did not hear about it until the next morning, and when called to the stand by the appellants Cook so testified before the jury.  Undoubtedly the cases against him were properly withdrawn from the jury.

And if Hollie could repeat statements made by Gosnell to him on the call of the appellants, that testimony is not controlling here.  If the defendants were racing, and Frizzell saw them, or by the exercise of reasonable care and caution could have seen them in time to prevent the accident as he proceeded across the highway, but did not do so, and the collision resulted, Frizzell was guilty of contributory negligence as a matter of law.  The proof in the case is that there was no traffic on the road, except the two cars which were referred to as racing, and Frizzell's car.  The headlights of the cars were burning.  Frizzell could see two-tenths of a mile from where he stopped at the intersection, to the curve around which these cars were coming.  He proceeded slowly to cross the intersection, slowly and steadily.

The witness Grego said he saw the lights of the racing cars when they rounded the curve two-tenths of a mile away, and yet Frizzell proceeded to travel slowly across the highway while these racing cars were approaching.  He could have stopped instantly and thus prevented the accident.  There is no evidence in the case that after Frizzell entered the highway he looked a second time.  Grego said that he noticed the oncoming racing cars when they came up a slight incline near Gamber Road, and the next thing he knew Frizzell had driven right down and in the path of these oncoming racing cars.  Of course, if Frizzell saw, or should have seen when he entered or as he proceeded across the intersection, that these cars were racing, it made his negligence more

flagrant to continue across the path of these racing cars. Under the evidence in this case, Frizzell was clearly guilty of negligence which directly contributed to the happening of the accident.

The appellants contend that the facts of this case justify the application of the doctrine of "last clear chance", but we think that there is no evidence in this case upon which the doctrine could be predicated. *Shedlock v. Marshall, supra; Congressional Country Club v. Baltimore & O. R. Co.*, 194 Md. 533, 71 A. 2d 696; *State for use of Landis v. Baltimore & O. R. Co.*, 196 Md. 459, 77 A. 2d 2.

The action of the learned judge below, in withdrawing these cases from the jury, was correct.

*Judgment in case No. 9897 affirmed, with costs.*

*Judgment in case No. 9898 affirmed, with costs.*