BROOKS ET AL. *v.* CHILDRESS ET AL.
(Ten Appeals in One Record)
[No. 153, October Term, 1950.]

*Decided May 17, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*J. Cookman Boyd, Jr.,* and *Henry M. Decker, Jr.,* with whom were *James W. Hughes* and *Paul C. Wolman* on the brief, for appellants.

*Clater W. Smith,* with whom were *E. D. E. Rollins, William B. Evans,* and *Clark, Thomsen & Smith* on the brief for appellee, Arthur Wesley.

*Theodore Sherbow,* with whom were *James J. Lindsay, Jr.,* and *Omar D. Crothers, Jr.,* on the brief, for appellee, G. N. Childress, etc.

COLLINS, J., delivered the opinion of the Court.

These appeals are from judgments for costs in favor of the appellees, defendants below, upon verdicts directed by the court.

On October 18, 1948, at about 3:45 P.M., the weather clear and the highways dry, Arthur Stanley Wesley, (Wesley), seventeen years of age, erroneously named in the amended declaration as Stanley Wesley, was operating a 1949 Pontiac Sedan, owned by his father, Arthur Wesley, one of the appellees, in a southerly direction on U. S. Route 40, a dual lane boulevard highway, a short distance from Elkton, Maryland. Each lane of this highway was twenty-two feet in width and separated by a grass plot forty feet wide. At the intersection of the Nottingham Road and Route 40 there was a cross-over or paved lane thirty feet in width traversing the grass plot and connecting the north and south bound lanes.

4

The "cross-over" allows traffic in the southerly lane of Route 40 to cross the grass plot and the north bound lane and enter Nottingham Road. As Wesley approached the Nottingham Road, with seven passengers in the car with him, he turned left into this cross-over leaving the south bound lane of Route 40 with the purpose of entering Nottingham Road and stopped in the cross-over very close to the north bound lane. In crossing the northbound lane he collided with a tractor-trailer of the Childress Transfer Company, (Childress), one of the appellees.

Three of the eight occupants of the Wesley car, including the driver, were instantly killed and four others died shortly afterwards. The only survivor was a two-year old boy, who was rendered unconscious. From directed verdicts for the appellees, in a suit in tort, the appellant appeals. Of course, therefore, we should resolve all conflicts in the evidence in favor of the appellant and assume the truth of all evidence and all inferences which may be naturally and legitimately deduced therefrom which tend to support appellants' claim.

Walter Edward Lawrence, a witness produced by the appellants, testified that he was driving his truck north on Routh 40 for the purpose of picking up his two children at the Nottingham Road. The children were in the middle of the dual highway between the two lanes on the grass plot. Before turning left into the cross-over, he opened the door of his truck and looked south on Route 40 and saw a vehicle which proved to be the Childress tractor-trailer back of him about four-tenths of a mile. He determined that he had plenty of time to cross the highway. He turned left into the intersection and stopped with the back end of his truck just clearing the north bound lane of Route 40. At that time Wesley stopped his car directly opposite the door of the truck with his front wheels very near the north bound lane. As Wesley stopped he turned his head and looked at Mr. Lawrence. The truck, being high, he could see Wesley's head and face because they were at a lower level. Lawrence said at that time the tractor-trailer was two-

tenths of a mile from him. Wesley then took his gaze off of Lawrence and pulled out to cross the highway. As Wesley started to cross the highway Lawrence diverted his glance from him to his children. Wesley crossed to the other side of the highway and Lawrence then heard the impact caused by the collision between the tractor-trailer and the Wesley automobile. Mr. Lawrence said: "The truck was then approaching there, it went out of my vision, and it looked as though to me that they both tried to get out of one another's way, the truck pulled around and Wesley pulled around and they had the impact, and the accident occurred in the back of my truck, and I didn't see the impact." Wesley had passed the middle of the highway before the impact. The tractor-trailer was on the right side of the highway. Mr. Lawrence said that he had been operating a motor vehicle for twenty years and he could not estimate the speed of the tractor-trailer. He said: "I saw the truck approaching here (indicating) as his car passed the center and I looked out my other window and saw parts of the car and the truck going through the guard rail and rolled over."

The tractor-trailer, weighing more than 13 tons and loaded with bales of cloth, coming slightly down grade, skidded approximately fifty feet before striking the Wesley vehicle. After the collision the tractor-trailer continued slightly down grade for a distance of 150 feet, pushed the passenger car against a guard rail and knocked over seven or eight steel guard posts and stopped overturned in a field to the east of the north bound lane. The Wesley car was knocked to pieces and scattered over an area of seventy-five feet.

The appellants here, of course, are not affected by the contributory negligence of Wesley and the doctrine of contributory negligence is not applicable in this case. The doctrine of last clear chance does not apply in this case for that doctrine is invoked only to avoid the bar of contributory negligence  Where there is no contributory negligence as in the case at bar the doctrine of

last clear chance of course does not apply. *Legum v. State*, 167 Md. 339, 355, 173 A. 565; *State v. B. & O. R. R. Co.*, 196 Md. 459, 464, 77 A. 2d 2, 5 and cases there cited; *Balto. Transit Co. v. O'Donovan*, 197 Md. 274, 278-279, 78 A. 2d 647, 649.

In the case of *Shedlock v. Marshall*, 186 Md. 218, 46 A. 2d 349, Miller was a passenger in Shedlock's automobile which was the unfavored car. Marshall's tractor-trailer was the favored vehicle. In that case it is said at page 237: "Miller, of course, could not be bound by Shedlock's contributory negligence, and if Shedlock and Marshall were both negligent and the negligence of both contributed to the accident, he (Miller) might have gotten a verdict against both. Shedlock's negligence had to be the proximate cause of the accident before Marshall was absolved." The question, therefore, before this Court in the Childress case is whether, assuming the truth of the evidence and inferences which may be naturally and legitimately deduced therefrom which tend to support the appellant's claim, the negligence of Arthur Stanley Wesley was the proximate cause of the accident.

In *Sun Cab Co. v. Faulkner*, 163 Md. 477, 163 A. 194, the Sun Cab had the green light before it, giving it the right of way. A Yellow Cab carrying an injured man, at an officer's instruction, went through the red light and collided with the Sun Cab. In that case Chief Judge Bond said at pages 479 and 480: "But taking it as proved that there was negligence in the rate of speed in this instance, that negligence, in the approach, must be found to have been the cause of the collision, or there can be no legal responsibility for it on the Sun Company's part. The principal cause was, obviously, the unexpected coming through of the Yellow Cab, in violation of the right of way. Its doing so was not a consequence of any speed maintained by the Sun cab. Whatever other consequences the speed might have threatened, it could not be said that it threatened to cause a collision with a cab so coming through. On the contrary, the situation created by it, if left to itself, with all its natural con-

sequences, would have been a safe one; and it was only by the intervention of the independent agency that the collision resulted, an independent agency not set in motion or at all influenced by the driving of the Sun cab. That being being true, the assumed negligence of the driver of that cab could not be treated as a proximate, legal cause of the accident and injury."

In this case the appellant seems to rely on the speed of the tractor-trailer as proof of negligence. The speed limit was fifty-five miles an hour and there is no evidence that Childress was exceeding that limit. To show speed, appellant presents skid marks fifty feet in length before the impact, the tearing down of steel guard posts by the tractor-trailer after the accident and the complete destruction of the passenger car. The evidence shows that this truck weighed more than 13 tons and contained a load of bales of cloth. No evidence was produced to show that the skid marks indicated excessive speed. No evidence was introduced to show the type of brakes on the truck, the condition of the road surface other than it was dry, the condition of the treads on the tires of the truck, or the reaction time of the driver. The driver here had no reason to believe that Wesley would disregard the boulevard law and pull out in the road in front of him. Of course, when a heavily loaded tractor-trailer strikes an automobile, the impact naturally causes much destruction. Negligence cannot be proven from testimony as to what happened after the accident. There is no evidence as to what occurred in the tractor after the collision. The truck driver may have been thrown from his position back of the wheel, with no control of the operation of the truck. The effect of the impact might have been to accelerate its speed by jamming the accelerator to the floor of the vehicle. As Childress points out, it is not difficult to understand how several steel guard posts 125 feet away from the collision could have been destroyed by the tractor-trailer weighing over 13 tons and heavily loaded, which was not being steered or controlled in any manner by its driver. There is no

evidence in this case as to the operation of the truck before, during or after the collision. Of course, speculation and conjecture are not sufficient to show negligence.

Rules as to collisions between motor vehicles at the intersections of through highways, as in the instant case, under Code 1947 Supplement, Article 66½, Sections 178 and 187, have been clearly and definitely stated and applied in many cases by this Court. The purpose of these statutes was clearly expressed in the case of *Greenfeld v. Hook*, 177 Md. 116 at page 125, 8 A. 2d 888 at page 892, 136 A. L. R. 1485, where it was said by Judge Offutt: "That statute imposes, upon one driving an automobile along or on a highway intersecting such a stop street, arterial highway, or boulevard, the duty of coming to a complete stop before entering the favored highway, and of yielding the right of way to all vehicles travelling thereon. The two duties, of stopping and of yielding the right of way, are correlated and coordinate. That of stopping is to give force and practicability to that of yielding the right of way, by requiring the inhibited traveller, before entering the intersection, to stop in order that he may ascertain whether traffic is approaching over and along the favored highway. The rule could have no other rational purpose, for unless the inhibited traveller yields the right of way to traffic on the stop street, the mere act of stopping would be idle, useless, and futile. The obvious and essential purpose of such rules is to accelerate the flow of traffic over through highways by permitting travellers thereon to proceed within lawful speed limits without interruption. That purpose would be completely frustrated if such travellers were required to slow down at every intersecting highway, and the vast sums which have been spent in their construction in an effort to accomodate the great volume of automobile traffic, which is so indispensable a part of modern life, would be largely wasted. On the other hand the safety of the travelling public demands that the rules defining the relative rights of travellers on through highways and on highways in-

tersecting them to clear, unmistakeable, and definite. If the duty of stopping and of yielding right of way is positive and inflexible, the inhibited traveller may know that he violates it at his risk, while the traveller on the favored highway may know that he may safely exercise the privilege of uninterrupted travel thereon, which the statute gives. If, however, the relative rights of travellers on the two types of highway are held to depend upon nice calculations of speed, time, and distance, the rule would encourage recklessness and the privilege of uninterrupted travel would mean little more than the privilege of having a jury guess in the event of a collision whose guess was wrong. If the traveller on a stop street were required to slow down and bring his car into control at every intersection there would be no perceptible difference between such a street and any other street on which traffic is controlled by the general rules of the road." This was quoted in the case of *Belle Isle Cab Co. v. Pruitt,* 187 Md. 174, at pages 178 and 179, 49 A, 2d 537.

In *Madge v. Fabrizio,* 179 Md. 517, 20 A. 2d 172, the beer truck was the favored vehicle on a favored way or boulevard. The Barth automobile was the unfavored vehicle and in crossing the boulevard there was a collision between these two vehicles. It was said in that case at page 523: "Appellant also makes the contention that because there is some testimony to the effect that the speed of the loaded beer truck exceeded the maximum allowed by law, this fact is sufficient to require the case to be submitted to the jury as showing negligence on the part of the truck driver, but this contention entirely ignores the fact that the proximate cause of the accident was not speed on the part of the truck, but the entry upon the boulevard by Barth in the path of the truck."

In *Rinehart v. Risling,* 180 Md. 668, at page 675, 26 A. 2d 411, at page 414, this Court said in holding that the demurrer prayer of the owner of the truck, the favored vehicle, should have been granted: "There is no evidence that this truck driver was not observing

the road ahead of him. It is admitted that he was on the right side of the road. * * * There is no evidence of any excessive speed on the part of the truck driver. * * * The driver of the truck, being the favored driver, had the right to assume that the unfavored car entering the boulevard would respect the provisions of the statute."

In *Balto. Transit Co. v. O'Donovan*, 197 Md. 274, 277, 78 Atl. 2nd 647, 648, an automobile pulled out from the grass plot between the driveways of a boulevard in front of a bus, the favored vehicle. This Court said in that case: "The rules applicable to collisions between motor vehicles at the intersection of through highways, under Code 1947 Supp., Article 66½, Sections 178 and 187, have been clearly stated and applied in recent cases. The cases were carefully reviewed in *Shedlock v. Marshall*, 186 Md. 218, 46 A. 2d 349. In that case we stressed the duty of the unfavored driver not only to stop but to yield the right of way to the favored vehicle during its entire passage over the intersection. In *Belle Isle Cab Co. v. Pruitt*, 187 Md. 174, 49 A. 2d 537, where the suit was by a passenger in the unfavored vehicle, the emphasis was placed upon the right of the favored vehicle to proceed upon the assumption that the unfavored vehicle would stop and yield the right of way. We held that the proximate cause of the accident was the entry of the unfavored vehicle rather than the speed of the favored one. Since the primary purpose of the statute is to speed the huge and growing volume of traffic, it would be quite impractical to require the operators of vehicles on the favored way to anticipate infractions of the peremptory command, and reduce speed at every intersection. *Blinder v. Monaghan*, 171 Md. 77, 83, 188 A. 31; *Madge v. Fabrizio*, 179 Md. 517, 520, 20 A. 2d 172. In the instant case we think the bus driver had the right to assume that the other vehicle, in a place of safety by the grass plot, would remain there and yield the right of way."

Applying the law, hereinbefore so plainly stated and often repeated by this Court, to the facts of this case

and all inferences legally deducible therefrom in a light most favorable to the appellant, it is evident that the speed of the Childress tractor-trailer was not the proximate cause of this accident and its demurrer prayer was properly granted. To have submitted this case to the jury would have required "nice calculations of speed, time, and distance," [*Greenfeld v. Hook, supra,*] which is forbidden in boulevard cases where the unfavored vehicle fails to give the right of way.

The amended declaration alleged against the father, Arthur Wesley: "Defendant, Arthur Wesley, through Stanley Wesley, his son and agent, acting with his permission and in his behalf, was negligent in the operation of his vehicle at the time of the accident as follows: * * *". The appellant admits that there was not sufficient evidence for the jury to find that the driver of the automobile was acting as agent for Arthur Wesley and with his permission and in his behalf.

Code, 1947 Supplement, Article 66½, Section 85, provides in part as follows: "(a) The application of any person under the age of eighteen (18) years for an instruction permit or operator's or chauffeur's license shall be signed and verified, before a person authorized to administer oaths, by a parent or guardian of the applicant. * * * The Department shall clearly set forth on the application the responsibilities assumed under this section. (b) Any negligence of a minor under the age of eighteen (18) years when driving a motor vehicle upon a highway of this State shall be imputed to the person who has signed the application of such minor for a permit or license, and that person shall be jointly and severally liable with such minor for any damages caused by such negligence. * * *." During the first day of the trial, the local counsel received information which led him to believe that Arthur Wesley, the father, had signed the son's application for a driver's license, but thinking the name of the son was Stanley Wesley, no record could be located in the Department of Motor Vehicles for any application for a driver's license in

12

the name of Stanley Wesley. During the second morning of the trial, the local counsel for appellant discovered that the real name of the operator of the car was Arthur Stanley Wesley, instead of Stanley Wesley, as alleged in the amended declaration.

It was then discovered that the counsel for Childress had in court a certificate from the Department of Motor Vehicles showing that the application of Arthur Stanley Wesley for a driver's license was "signed by Arthur Cecil Wesley, father, as parent consenting to granting of application". Appellant then endeavored to offer this certificate in evidence as Plaintiff's Exhibit No. 10 and this was refused. The appellant then asked for permission to further amend the declaration to read as follows: "In paragraph one where it reads on the 18th day of October, 1948, about 3:30 p.m., a passenger automobile owned by defendant Arthur Wesley and operated by Stanley Wesley, I want the following to be added. Age seventeen years, said Arthur Wesley having signed the application for a driver's license of the said Stanley Wesley as required by statute. All the rest is to be as appears already on the record. Paragraph three, defendant Arthur Wesley through Stanley Wesley, his son, driving the automobile as stated in paragraph one of this declaration did the following things in accordance with the rest of paragraph four." The trial court then stated that the case against the defendant Arthur Wesley was "by reason of common law agency in the operation of the motor vehicle involved in these cases. The motion to amend is intended to make the declaration conform to the statutory liability imposed by Article 66½, Section 85, Sub-section (b). * * * In the opinion of the Court this is a statutory cause of action and to permit the amendment requested is to state an entirely different cause of action from that originally declared upon and under which this case had been tried, and when all of the testimony of the plaintiff concluded. * * * This question has arisen in this case by reason of some overnight activity, since the taking of practically all the evidence

yesterday." The further amendment was therefore refused and Plaintiff's Exhibit No. 10, *supra*, was not permitted to be offered in evidence. Objections were seasonally made to these rulings of the trial judge. We agree with the trial judge that this exhibit was not admissible under the amended declaration as then filed. This certificate constituted a variance. *Smith Co. v. Smick*, 119 Md. 279, 86 A. 500; *Wilson v. Kelso*, 115 Md. 162, 80 A. 895.

The remaining question is whether or not the amended declaration should have been further amended as requested by the appellant. Ordinarily no appeal will lie from the action of a trial court in allowing or refusing amendment. *Poe's Practice*, Fifth Edition, Section 190; *Engle v. Fidelity & Guaranty Co.*, 175 Md. 174, 185, 200 A. 827.

The main reason given by the trial judge in refusing the further amendment was that, if it were permitted, the second amended declaration would then state an entirely different cause of action from that then declared upon. With this conclusion of the learned judge we do not agree. The appellee, Arthur Wesley, also maintains in his brief that the further amendment proposed by the appellant would allege a new and different cause of action and that such new action would have been barred under the provisions of Lord Campbell's Act, *Spencer v. B. & O. R. R. Co.*, 126 Md. 194, 94 A. 660. In the case of *Zier v. Chesapeake Railway Co.*, 98 Md. 35, 56 A. 385, the original declaration was brought to recover damages for the death of plaintiff's husband, a fireman on the train of defendant's company, and alleged want of diligence on the part of the officials or some of the employees of the defendant. An amendment was made adding an additional count alleging that the negligence of the defendant consisted of its failure to use due care in the selecting of its fellow servants by whose carelessness the death of the plaintiff's decedent was caused. A plea of limitation was then filed to this additional count

14

and was sustained by the lower court. In reversing, this Court said through Chief Judge McSherry at pages 42 and 43: "Did the amendment change the cause of action? As we have said the suit was brought under *Art. 67 of the Code,* which permits an action to be maintained to recover damages whenever the death of a person shall be caused by wrongful act, neglect or default; if the act, neglect or default (had death not ensued) would have entitled the injured party to recover damages in respect thereof. Now, the original declaration though defective was founded on the alleged negligence of the defendant. The fact that the *narr* was insufficient in law—that it did not accurately and formally set forth the real cause of action—did not prevent the suit itself from being a pending suit wherein the gravamen was the negligence of the defendant. When the amendment was made precisely the same cause of action was declared on. It is true it was imperfectly stated in the first count, but in the second it was correctly set forth. The negligence alleged in the first count was the negligence of the defendant through its agents, but was none the less the negligence of the master, though as respects a servant of the master it was not actionable. In the second count the negligence alleged was again the negligence of the master in failing to exercise due care in the selection of the fellowservants by whom the injury was inflicted. But the suit to recover for defendant's negligence was precisely the same after the amendment had been made that it was antecedently. The *statement* of the cause of action was different but the *cause of action* itself was identical. Injury resulting in death is what occasioned the suit. The imperfect statement of the case did not cause the correct statement of it to be a different cause of action. Being the *same* cause of action the accurate statement of it in the amended declaration did not convert the original suit into a new and different suit; and therefore did not warrant the filing of any other plea of the Statute of Limitations than such as could have been interposed to the original *narr.* * * * There was,

consequently, error in overruling the demurrer thereto."
See also *O'Shaughnessy v. Bayonne News Co.*, 154 A.
13, 14, 9 N. J. Misc. 345; *Johnson v. Hardware Mutual
Casualty Co.*, 109 Vt. 481, 1 A. 2d 817, 820; *Daley v.
Gates*, 65 Vt. 591, 27 A. 193; Compare *Hamlin Machine
Co. v. The Holtite Mfg. Co.*, 197 Md. 148, 78 A. 2d 450.
In the instant case, as in the *Zier* case, *supra*, if the
further amendment had been allowed, precisely the same
cause of action would have been declared on. The
declaration before the Court was one predicated upon
the father's responsibility for the negligence of his son,
while driving with the "permission of his father". In
the amendment sought the allegation was again negli-
gence of the father imputed to him with his consent in
signing his son's application for a driver's license.

Rule 4, Section 1, of the Rules of the Court of Appeals
provides: "In all cases where judgments shall be re-
versed or affirmed by the Court of Appeals, and it shall
appear to the Court that a new trial ought to be had,
such new trial shall be awarded and a certified copy
of the opinion and judgment of the Court of Appeals
shall be transmitted forthwith to the court from which
the appeal was taken, to the end that said cause may
be again tried as if it had never been tried; and no
writ of procedendo, with transcript of record, shall be
transmitted as heretofore practiced." Code, Article 5,
Section 24; *Gostin v. Needle*, 185 Md. 634, 641, 45 A. 2d
772, 163 A. L. R. 1013, and cases there cited. Believing
that the ends of justice require that the amended declara-
tion as to Arthur Wesley be further amended, we will
grant a new trial for the purpose of a further amendment
as to the father, Arthur Wesley.

> *Judgment affirmed, with costs, and cause
> as to Arthur Wesley, the father,
> remanded for a new trial.*

MARKELL, J., delivered the following dissenting opinion.

I cannot agree that a verdict should have been directed for Childress.

All testimony as to speed or distance in an automobile case reflects frailties of human judgment, which the jury must weigh. Within the limitations of human frailty, the witness Lawrence had exceptional opportunity to observe the positions of the Wesley car and the Childress truck at the time the car pulled out of the crossover into the northbound lane. The "back end" of Lawrence's truck "just cleared that lane" and Wesley's "front wheels were very near the northbound lane". Lawrence's truck on the north side of the cross-over and the Wesley car on the south side were directly opposite each other, facing in opposite directions, neither moving. The truck was higher than the car. Lawrence could look down into Wesley's face and could also look straight ahead (at a minutely different angle), beyond the car, at the Childress truck. When he first looked back, before he pulled into the place where he stopped, he saw the Childress truck about four-tenths of a mile away. "I am positive of that, it was four-tenths of a mile." Wesley "stopped and turned his head and looked at me in the face." "I could see the truck. My truck was a high truck and I could see his head, a man's head in the car. I could look over the top and I could see his head and his face. They were at a lower level when he was sitting in the car than I was. Q. Now, the approaching truck was how far away at that time? A. Well, I would say he had covered about half the distance * * * Two-tenths of a mile. Q. And what did Wesley do at that time? A. Wesley took his gaze off of me and pulled out to cross the highway."

In short, when the Wesley boy moved his car, full of human cargo, into a place of helpless peril, in full view of the Childress truck, the truck was about two-tenths of a mile—more than a thousand feet—away. If

the jury believed this testimony, it might legitimately infer—how could it help inferring?—either that the truck was driven too fast (if that were possible) to stop within one thousand feet, or that the truck driver was not paying attention to the road ahead of him, or that his failure to stop was due to both excessive speed and inattention. Any such inference would be consistent with the near-complete slaughter—seven out of eight killed—and the other physical results of the accident. It is suggested that after the accident the truck driver may have lost control of the truck and the accelerator may have been jammed to the floor. If the latter is a possibility, it is a speculative possibility, unsupported by evidence.

This is not a prosecution for murder or manslaughter or even for the venial offense "manslaughter by automobile". It is said that "this truck weighed more than thirteen tons and contained a load of bales of cloth. No evidence was introduced to show that the skid marks indicated excessive speed. No evidence was introduced to show the type of brakes on the truck, the condition of the road surface other than it was dry, the condition of the treads on the tires of the truck, or the reaction time of the driver". Has any such evidence ever been held necessary to take a negligence case to the jury? What more could be shown about the condition of the road? Skid marks often speak for themselves, without further evidence to explain them. If these fifty foot skid marks before the collision do not indicate excessive speed, they may confirm alternative or cumulative neglect to make any effort in the first thousand feet to avoid the collision. If "the primary purpose of the statute is to speed the huge and growing volume of traffic", there is no mandate to pursue this purpose utterly regardless of life or limb. No one is legally obliged to drive any motor vehicle at fifty-five miles an hour. The most alert driver, of a car in perfect condition, most easily controlled, is forbidden to drive at a greater speed than fifty-five miles per hour. If a thirteen ton truck is

more difficult to control than a passenger car (as it doubtless is), if the brakes are unsuitable or out of repair, if the treads on the tires are worn, or the driver's reaction time, by reason of age or ill health, is slow, any or all of these circumstances are not an excuse for negligence, but are a monition to greater care and less speed. It is said that "the driver here had no reason to believe that Wesley would disregard the boulevard law and pull out in the road in front of him". But after Wesley had disregarded the boulevard law by pulling out in the road in front of him, in plain view for more than a thousand feet, the driver had no right to mow them down.

It is said that "the speed of the Childress tractor-trailer was not the proximate cause of this accident and its demurrer prayer was properly granted. To have submitted this case to the jury would have required 'nice calculations of speed, time and distance'. *Greenfeld v. Hook,* * * *, which is forbidden in boulevard cases where the unfavored vehicle fails to give the right of way." This conclusion is reached after a full review of cases in this court from *Sun Cab Company v. Faulkner,* 163 Md. 477, 163 A. 194, to *Baltimore Transit Company v. O'Donovan,* 197 Md. 274, 78 A. 2d 647, including *Greenfeld v. Hook,* 177 Md. 116, 8 A. 2d 888, 136 A. L. R. 1485. In the *Faulkner* case, the *O'Donovan* case, and similar cases, the unfavored driver (or pedestrian) had pulled (or stepped) in front of the favored vehicle without giving warning or reason to expect such an act, and too late for the favored driver to avoid collision afterwards. The difference between those cases and cases where excessive speed prevented the favored driver from avoiding accident after opportunity to see the peril of the unfavored vehicle, was pointed out in the recent case of *Miller v. Graff,* 196 Md. 609, 618, 78 A. 2d 220, 223. The difference between the cases cited and the instant case is about one thousand feet—much greater than in *Miller v. Graff.*

Although "nice calculations of speed, time and distance" are said to be forbidden by *Greenfeld v. Hook,* the fact is that in *Greenfeld v. Hook* this court did submit to the jury the question whether "the plaintiff's position was or should have been apparent to the defendant *for nearly half a square*" [italics supplied] 177 Md. 132, 8 A. 2d 895, 136 A. L. R. 1485. I recognize that the decision on the facts in *Greenfeld v. Hook* may perhaps be irreconcilable with later cases applying the principles of *Greenfeld v. Hook.* But no case before the instant case suggests that a favored driver is under no duty to see and avoid persons in peril, in plain view, anywhere near a thousand feet away. In *State use of Frizzell v. Gosnell,* 197 Md. 381, 79 A. 2d 530, both cars were in sight of each other for a thousand feet, but we held that the negligence of the deceased was concurrent up to the last moment and we did not decide that the defendant was free from negligence.

Unlike *Greenfeld v. Hook* the instant case does not involve the "last clear chance" doctrine, because there is no question of contributory negligence. In that respect the instant case is a simpler case. It is, however, a typical case of the kind of negligence of which the "last clear chance" doctrine furnishes an example, *i.e.,* failure to see and avoid a person in peril after he is unable to help himself. No nice calculations are required in this case.