UNITED RAILWAYS & ELECTRIC COMPANY *v.* STATE, TO THE USE OF CECELIA LAPKA ET AL.
[No. 13, October Term, 1932.]

314

*Decided November 16th, 1932.*

The cause was argued before URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Lee S. Meyer* and *Philip S. Ball,* for the appellant.

*Leonard Weinberg* and *Howard A. Sweeten,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

This is an action brought for the use of the widow and infant children of Theodore J. Lapka, to recover compensation for his death, which, the equitable plaintiffs contend, resulted from a collision between an automobile in which he was a passenger and a street car operated by the United Railways & Electric Company of Baltimore, the defendant, which occurred at the intersection of East Avenue and Elliott Street in Baltimore City on February 14th, 1931, shortly after 2 o'clock in the morning.

The trial of the case in the Baltimore City Court resulted in a verdict and judgment for the plaintiff, and from that judgment the defendant has taken this appeal, which presents two questions: (1) Whether the trial court erred in refusing to direct a verdict for the defendant; and (2) whether it erred in refusing defendant's prayers numbered 8 and 8½.

The following facts, which appear in the record, are not disputed and may be stated in narrative form: Theodore J. Lapka, with Frank Poston, Charles S. O'Hara, and Leroy E. Kagle, were on Friday, February 13th, 1931, employed at the Sparrows Point plant of the Bethlehem Steel Company. The four were friends, and at the end of the day's work O'Hara, who owned an automobile, regularly drove Poston and Kagle to their homes and occasionally Lapka. On the evening referred to, they all finished their work a few minutes after 11 o'clock, and while O'Hara was in the locker room preparing to return to his home, Lapka approached and asked if he would take him, that is, Lapka, to his home in O'Hara's automobile. O'Hara consented, and the four left the plant at about a quarter of 12. The automobile was a

Chrysler runabout, and O'Hara, who drove it, Poston, and Kagle sat in the front seat, and Lapka in the rumble seat at the rear. On their way into the city they stopped first to have some checks cashed, then at a friend's to whom Poston wanted to pay some money, and shortly after they left there Poston left the machine, leaving in it O'Hara and Kagle in the front seat and Lapka in the rear or rumble seat. O'Hara then started to drive to Lapka's home, which was on Boston Street, and to reach it he drove west on Eastern Avenue to East Avenue, and turned south on East Avenue. As he attempted to cross Elliott Street, which, running east and west, intersects East Avenue, his automobile collided with a westbound street car operated by the defendant, and following the collision went diagonally across the intersection and ran into the front of a grocery store located on its southwest corner. After the accident Lapka was found lying on the sidewalk near the automobile, either dead or suffering from injuries which almost immediately caused his death. Elliott Street at that point, from building line to building line, is about 70 feet wide. The roadway is about 42 feet ½ inch wide; the distance from the north curb line to the north rail of the westbound track is 13 feet 4 inches, from that rail to the south rail of the eastbound track 15 feet 4½ inches, and from the south rail to the south curb 13 feet 3 inches, and the sidewalks on either side are 13 feet 11 inches wide. The roadway of East Avenue is 41 feet 6 inches wide, and it is bounded on the west side by a sidewalk 14 feet 3 inches wide, and on the east side by a sidewalk 14 feet 2 inches wide.

The evidence relating to the actual occurrence of the accident is conflicting, and the opposing theories predicated upon that evidence quite irreconcilable. The plaintiff contended that it was caused by the conduct of the defendant's motorman in operating its street car at a high and unlawful rate of speed across an intersecting street, and in failing to take reasonable care to avoid striking O'Hara's automobile, which was in the lawful use of the intersecting street, after he became aware or should have become aware of O'Hara's in-

tention of crossing in front of the street car, and that Lapka's death was caused by the collision.

The defendant's theory appears to be: (1) That the direct and proximate cause of the collision was the high speed at which O'Hara operated his automobile; and (2) that Lapka's death was caused, not by the collision between the street car and the automobile, but by the collision between the automobile and the street curb or the store front, which it says was occasioned by O'Hara's negligence.

There were but two witnesses who actually saw the entire occurrence, O'Hara, and the motorman who operated the defendant's street car.

O'Hara testified: "I was coming down at a moderate rate of speed and as I approached within fifteen or twenty feet of the building line, I looked to my left and decreased my speed and seeing nothing coming I continued on and glanced to my right. As I reached the building line I looked to my left and saw the street car at least a quarter of a block east on Elliott Street and continued on and looking again to my right as my front wheels approached the car track, the north rail of the westbound car track, I looked and saw this street car coming at an awful rate of speed and seeing it would do me no good to stop or I would be right in the middle of the tracks, I increased my speed and pulled to the right in an effort to avoid a collision. "Q. What happened? A. The street car hit me on the left rear end and drove me into the store front on the opposite side of the street, southwest corner. Q. Had there been any bell rung or anything by the street car? A. No, sir, no warning whatever. Q. Were your lights burning as you went down there? A. Positively. Q. When you say you got to the—got out on the car track or the rail of the westbound car track, north rail, and saw this street car coming, how was it going? A. Very fast. Q. Have you any idea what rate of speed it was going? A. I couldn't say the exact mileage, but it was going, I would say, in excess of twenty-five miles an hour."

He further testified that the street car did not stop until it nearly reached the next intersecting street, which is Robin-

son; that he felt as though the left front end of the street car struck the automobile; that the headlight of the street car was burning and that he had no trouble in seeing it; that when he came to the intersection he was driving at about fifteen miles per hour and could have stopped the automobile before it reached the curb, and after it reached the curb he could have stopped it before it reached the railway tracks.

Charles Waterman, the motorman, gave this description of the accident: "I was westbound on Elliott Street Friday, February 13th, 1931, at 2.10 A. M. in the morning; approaching East Avenue I slacked my car down to a speed of about twelve miles an hour and tapped on the gong before I hit the building line of the street. When I hit the building line, I looked to my right. I seen the headlights of this automobile. Right away I glanced to my left and there was nothing coming, and I released my air brake and started to feed my car up, and I looked back again to my right and saw this automobile about forty or fifty feet away from me, when my car was about centerway from the curb to a few feet, from the center of the curb about midway from the center of the curb to where the accident happened, a little beyond the center of the street is where the accident happened. He was about forty or fifty feet away then. When I seen him and noticed that high speed there was nothing else to do but shut the power off and try to stop the car, and before I was able to control the car in the manner in which I should, the force of the impact struck on the right front corner of my street car and threw me back up into the car to where that iron rod is at the conductor's fare box and I lost complete control of the car and I could'nt see nothing but like smoke or dust for a few seconds, I will say, and the car had to stop itself; I lost complete control of it. After the car stopped, we ran off the car and we ran over and seen the conductor, he was talking to the man who— the conductor was talking to the man that drove it, later to be Mr. O'Hara, the driver of the machine. * * * Of course, the controller was laying down on the floor and glass splattered all around and the little door on the left side, the

conductor's door, the one on the front end was off. * * * I just couldn't say where the door fell off the car because it seemed like everything fell as the car was going along, just that way, and glass all flew, of course, and it was either smoke or glass or I shut my eyes, I wouldn't say. * * * I took that car out at one o'clock, that car that I was using, I hadn't used it the first part of the night. The car operated O. K. The brakes was O. K. I took it from Druid Hill Park to the foot of Clinton Street. * * * When you saw this automobile coming down the first time was it near the track or where? A. When I saw him when I approached the building line the automobile was a hundred and fifty to two hundred feet up the street."

When asked whether the automobile was "going fast at that time," he replied, "He wouldn't go any faster, the speed wouldn't; he couldn't go any faster." He further said that he "noticed the speed" of the automobile when it was forty or fifty feet from him, and that he at that time was about midway between the curb and the point at which the accident happened, which was about three feet beyond the center of the street. That he had increased his speed, but could have stopped the car within ten or twelve feet because he had the "cylinders full of air."

Kagle, who was on the front seat of the automobile with O'Hara, was dozing and knew nothing of the accident until the "crash came" and he "found the automobile against the bow window of the store."

Lawrence H. Klaus, the conductor of the street car, said that he was standing at the second window from the rear of the car and got "a catty cornered glance up East Avenue" when he saw the automobile sixty or seventy feet up the street "coming at a terrible rate of speed." It appeared from the other testimony that the automobile struck the store front with such force that the "bottom of the window, the base, was all knocked out; it had gone right through that"; that the front of the building was completely demolished, and Lapka was lying with his head against a corner of the wall; that the front windows of the street car were all

shattered, the "left front door was hanging" and eventually fell in the street, the controller was knocked off, there was a crack in the air line, and a step near the front on the right side of the car was split. It also appeared that the street car weighed twenty-four tons, and Cornelius E. Hearn, chief instructor of the instruction department for motormen and conductors, said that it had a maximum speed of from nineteen to twenty miles per hour and that under favorable conditions when going at ten miles per hour it could be stopped in ninety feet.

There was also in evidence an ordinance of the City of Baltimore limiting the speed of street cars at intersections to fifteen miles per hour, and requiring persons operating the same to have them under control, and not to exceed what would be a reasonable and proper speed "in view of the circumstances, surroundings and location."

At the close of the entire case the plaintiff offered three prayers, which were granted, and the defendant sixteen, all of which, except its prayers for a directed verdict and its 8 and 8½ prayers, were granted.

The plaintiff's prayers were the usual stereotyped expressions of the law applicable to such cases. While its first or recovery prayer was too general in its nature to be of much assistance to the jury, its omissions were corrected by the defendant's prayers, and since no objection to any of them was suggested to this court, they need not be discussed.

The defendant's first two demurrer prayers raise the question whether the evidence was legally sufficient to show that it was guilty of primary negligence, and that question will be first considered.

The defendant's contention rests mainly upon the hypothesis that the testimony of O'Hara is inherently incredible, without probative force, and must be disregarded. It attempts to demonstrate that conclusion by a series of elaborate and ingenious calculations based upon the testimony of O'Hara, Waterman, the motorman, and Klaus, the conductor, as to speed and distance.

But, as a matter of common sense, it is obvious that estimates of speed and distance from observations made under the stress and confusion of a sudden and dangerous emergency must in their very nature be largely conjectural and lack the certainty and precision necessary to give such calculations the final and conclusive effect assumed in that contention. In substance, the testimony of O'Hara was that, when he reached the building line of Elliott Street, he saw the street car approaching from his left a "quarter of a block east." He at that time was about twenty-seven feet from the north rail of the westbound track, proceeding south towards it at from twelve to fifteen miles per hour. He did not look to his left again until the front wheels of his automobile approached that track, and he then saw the car coming at an "awful rate of speed," in "excess of twenty-five miles an hour." He could have stopped his automobile at the rate he was going in about thirteen feet; nevertheless, although he knew of its approach from the time he left the building line, he did not stop until too late to avoid a collision with an onrushing car coming towards him at "an awful rate of speed."

The testimony of the motorman was almost the precise converse of that of O'Hara. He said that, as he reached the building line of East Avenue, he saw the approaching automobile, then from 150 to 200 feet away; that he "slacked" his car down to twelve miles an hour, tapped his gong, released his brakes, and started to "feed" his car up; that when he was about half way between the curb and the point of impact (about twelve feet from the curb), he looked again and saw the automobile about forty or fifty feet away approaching at high speed; that he then attempted to stop, but was unable to do so in time to avoid a collision. The speed of the automobile, from his estimate of distance and the speed of the street car, was from forty-five to ninety miles an hour, and under the conditions he could have stopped the street car, which was proceeding at from twelve to fifteen miles an hour, in twelve feet. So that although he knew of its approach he made no effort to stop until it was too late to avoid a collision

with the automobile, which was approaching, in his judgment, at from forty-five to ninety miles an hour.

Appellant contends that that testimony and the other evidence to which reference has been made affords no legally sufficient evidence of primary negligence, and it rests that contention upon the proposition that O'Hara's statement that, when he reached the north rail of the westbound tracks, the street car was between the building line and the curb, which it is said would indicate "an incredible speed of over fifty-six miles an hour," was so preposterous as to deprive it of any probative force, and that without O'Hara's testimony there is no legally sufficient evidence of primary negligence. The basis of that criticism, however, involves several fallacies. It assumes that, when O'Hara said that the street car was "between the building line and the curb," he meant that the front of the car had reached the center line of the pavement; whereas there is no testimony to support that assumption, for his statement that the car was "between the building line and the curb" would have applied to any point between those limits. Again it holds the witness to a degree of accuracy in estimating the position of the street car, which under the conditions was wholly beyond the faculties of the ordinary man. O'Hara's estimate of the rate of speed at which the car was traveling measured in miles per hour, assuming that he was qualified to give such an opinion, of which there is no evidence, was under the conditions obviously a mere conjecture, has indeed little probative force, and if that were an issue in the case, would have little weight; but that criticism has no application to the statement that the car was approaching at "an awful rate of speed," for while he may not have been able to estimate just how fast it was coming, he could in a general way know whether it was coming fast or slow. Finally it was the office of the jury, or of the trial court on a motion for a new trial, but not that of this court, to weigh that testimony, for it cannot be said that because the estimates of the witness, made in what appellant's counsel well described as a "split and terrifying second," appear excessive or inaccu-

rate, that his whole testimony must be rejected as unworthy of belief.

But the evidence supporting the plaintiff's case is to be found not so much in the testimony of O'Hara as in that of the motorman, for if O'Hara's testimony is taken literally, then he drove his automobile, which was fully under control, in front of a twenty-four ton street car approaching at an "awful rate of speed," which was and had been in full view for a quarter of a block. Under such circumstances it might well have been inferred that his act was the direct and proximate cause of the accident.

But to the extent to which his testimony, if true, would inculpate O'Hara, the testimony of the motorman would inculpate the appellant. For he said that he proceeded to cross the path of an automobile which had been in full view for possibly 200 feet and which had come possibly 150 feet while the street car traveled twenty-six or twenty-seven feet, when he could, had he exercised ordinary vigilance, have seen that a collision was inevitable unless he stopped, and that he could have stopped after he saw the automobile and after he entered the intersection in time to avoid the collision.

Such conduct afforded some evidence of negligence, for the rights and duties of the driver of the automobile and the motorman in the operation of their respective vehicles were reciprocal, and each was bound to exercise ordinary care to avoid injuring the other. *United Rys. & Elec. Co. v. Mantik,* 127 Md. 209, 96 A. 261; *Union Traction Co. v. Moneyhun,* 192 Ind. 288, 136 N. E. 18; *Bradley v. Minneapolis St. R. Co.,* 161 Minn. 322, 201 N. W. 606; 63 *A. L. R.* 11; *Barnes v. United Rys. & Elec. Co.,* 140 Md. 14, 116 A. 855. It was just as incumbent upon the motorman to assume as a matter of ordinary prudence that an automobile coming at such a tremendous speed might not be stopped in time to avoid a collision if the car proceeded on its way, as it was upon O'Hara to assume that the street car could not stop in time to avoid a collision, if it was traveling as fast as he said it was.

But in dealing with the legal sufficiency of the evidence to warrant the submission of the case to the jury, the court was not confined to the testimony of the motorman or of O'Hara, but it was bound to consider all the evidence in the case, whether offered by the plaintiff or the defendant. For as was said in *Consolidated Ry. Co. v. Pierce,* 89 Md. 504, 43 A. 940, 942 : "But when an instruction to the effect that there is no evidence legally sufficient to entitle the plaintiff to recover is offered at the conclusion of all the testimony,—both the plaintiff's and defendant's,—the court must consider the whole evidence, and not that of the plaintiff alone, for that offered by the defendant may supply a defect in the proof of the plaintiff. *State, use of Harvey, v. Balto. & O. R. R. Co.,* 69 Md. 339, 14 A. 685, 688. The jury may have believed the plaintiff's story, as to the circumstances of the accident, in all respects, excepting the statement attributed to the motorman, and might have found that the motorman was simply negligently discharging his duties. Indeed, if we take into consideration the verdict in connection with the defendant's third and fourth prayers, it is evident they, in point of fact, did so."

In applying those principles to the facts stated, it must be remembered that the question under consideration is primary and not contributory negligence. And dealing with that question, the jury could have found that both the street car and the automobile were approaching, at a high and unlawful rate of speed, a point at which it was probable that they would collide unless one or the other stopped, but that neither yielded the right of way nor gave any warning of an intention of taking it, and that as a result of their concurring acts the collision occurred. Such facts furnish a complete illustration of concurrent primary negligence, sufficient to charge either tort-feasor with liability for injuries to a third person injured by the collision, who had not by his own negligence contributed to it. For these reasons we find no error in the refusal of the defendant's A and B prayers.

By its C, D, E, and F prayers, in slightly variant form, appellant submitted the proposition that there was no evi-

dence legally sufficient to show that Lapka's injuries were caused by the collision between the street car and the automobile. The basis of that theory is that Lapka's body was found on the sidewalk near the grocery store on the southwest corner of East Avenue and Elliott Street, some forty or fifty feet from the point of the collision between the automobile and the street car. From that fact appellant infers as a matter of law that the injuries which caused Lapka's death were caused by the collision between the automobile and the store front, which it says was due to the negligence of O'Hara and not to that of the defendant.

That contention, however, finds no support in the evidence submitted by the record. It is not possible from that evidence to say whether Lapka was injured as a result of the impact of the street car against the automobile or as a result of the impact of the automobile against the store front. There is no doubt whatever that he was injured, and it is consistent with the evidence that the injuries resulted from the one or the other. The photographs offered in evidence and the testimony of certain witnesses for the plaintiff indicated that the left side of the rear end of the automobile was badly damaged and that when it finally stopped the left front end was in the store window. From that it could be as rationally inferred that Lapka was injured when the street car and automobile collided, as when the automobile ran into the store front. But whether he was injured at the time the automobile collided with the street car or when it struck the store front is quite immaterial if its collision with the store front was caused by its collision with the street car, for the law looks to proximate and efficient, and not to remote, causes. And if there was such a causal connection between the first collision and the second, that a reasonable mind might fairly infer that the second was caused by the first, the two will be regarded as connected events in a single continuous act. *Scott v. Shepherd,* 2 Wm. Bl. 892. "Proximate cause," it is said in 50 *C. J.* 838, "has been defined as that which, in a natural and continuous sequence, unbroken by any new cause, produces an event, and without which the event would not

have occurred, the efficient cause; the cause that sets another or other causes in operation; the one that necessarily sets the other cause or causes in operation; the efficient cause— the one that necessarily sets the other causes in operation (the causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones, although they may be nearer in time to the result); that which stands next in causation to the effect—not necessarily in time or space, but in causal relation."

Applying those principles to the evidence in this case, it cannot be said as a matter of law that Lapka's injuries were not occasioned by the collision between the automobile and the street car. O'Hara testified that "the street car hit me on the left rear end and drove me into the store front on the opposite side of the street, the southwest corner." O'Hara was in a position to know more about that than any one else who testified; he was driving, and, so far as the record discloses, in the full possession of his faculties, and there is nothing so improbable in the hypothesis that a twenty-four ton street car going at a high rate of speed could strike such an automobile as O'Hara was driving, also proceeding at a high speed, with sufficient force to drive it into the store front some fifty feet away, as to justify this court in rejecting O'Hara's testimony as incredible.

Appellant further suggests that Lapka may have been injured in jumping from the automobile. But the force of that suggestion is not apparent, for even if it were so, it would not exculpate the appellant. For if in the confusion incident to a sudden and terrifying emergency, caused in whole or in part by appellant's negligence, Lapka in an effort to avoid one peril encountered another, his injuries would nevertheless be attributable, not to his choice of risks, but to the emergency which induced the choice. 45 *C. J.* 517; *Allen v. Shultz,* 107 Wash. 393, 181 P. 916; *Southall v. Smith,* 151 La. 967, 92 So. 402; *United Rys. & Electric Co. v. Mantik, supra.* There was no error therefore in refusing the

defendant's C, D, E and F prayers, nor in overruling defendant's special exceptions to the plaintiff's first prayer.

Defendant also specially excepted to plaintiff's second or damage prayer, but those exceptions were abandoned in this court and need not be considered further than to say that upon the facts of this case they were properly overruled.

Apart from its prayers going to a directed verdict, all the defendant's prayers except those numbered 8 and 8½ were granted. The court sustained a special exception to defendant's prayer numbered 8, and refused it. But as no point was made in this court of the exception to that ruling, it will be treated as abandoned. *Rules of the Court of Appeals,* No. 39, sec. 4.

By its 8½ prayer, which was also refused, the defendant asked the court to instruct the jury that, if they found that Lapka fell or was thrown from the automobile in which he was riding as a result "of the said automobile either striking the curb, or colliding with the building mentioned in the evidence," and that the driver of the automobile could by the exercise of ordinary care have prevented those collisions, and that "his failure so to do was the sole cause of the said Theodore J. Lapka being injured, from which injuries he died, then the verdict of the jury should be for the defendant." As stated, the defendant's theory of the case was that if Lapka's injuries were caused, not by the collision between the automobile and the street car, but solely by a collision between the automobile and the curb or the building, it was not responsible for them if O'Hara could by the exercise of ordinary care have prevented the automobile from striking either the curb or the building, and it was entitled to have that theory submitted for the consideration of the jury if there was any evidence in the case legally sufficient to support it. *Adams v. Somerset County,* 106 Md. 201, 66 A. 695; *Security Storage & Trust Co. v. Denys,* 119 Md. 347, 86 A. 613; *Howard County v. Pindell,* 119 Md. 81, 95 A. 1041; *Harford County v. Bel Air Sub. Imp. Asso.,* 134 Md. 552, 107 A. 348. The ruling in respect to that prayer, therefore, involves two questions: (1) Was there in the case

evidence legally sufficient to support it; and (2) did it fairly and correctly state the law? The first question presents little difficulty. Without repeating what has already been said, it is enough to add that there was in the case evidence from which the jury could have found that, at and immediately before the collision with the street car, O'Hara was driving his automobile at a high, unlawful, and reckless rate of speed, and that that fact was the sole cause both of the collision with the street car and the collision with the store front which followed, that but for such ensuing collision Lapka would not have been injured, and that the sole cause of his injuries was the alleged negligence of O'Hara.

The second question is whether the prayer fairly and correctly states the law. In effect it states that, if the sole cause of Lapka's injuries was the failure of O'Hara to exercise reasonable care to prevent the automobile from colliding with the curb or the building, the defendant was not liable. Assuming the correctness of that proposition, the appellant was not injured by the refusal of the prayer, for by its 6½ and 7 prayers the jury were told that if they found that the "accident was caused solely by negligence on the part of" O'Hara, or if they failed to find that "plaintiff's decedent was injured in a collision between the street car and the automobile," their verdict must be for the defendant. But apart from that consideration, the prayer itself was properly refused because it was misleading. All the evidence in the case related to the negligence *vel non* of the defendant in relation to the collision between its car and the automobile, and there was no evidence of any kind as to the operation of the automobile after that collision except that of O'Hara, who said that the street car "drove" him into the building. But the prayer makes no reference at all to the negligence involved in the collision with the street car, except that it predicates recovery upon a finding that O'Hara's failure to prevent his automobile from striking the curb or the building was the "sole cause of the accident". In that form the prayer was too general to be a safe or a satisfactory guide,

330

and was more likely to mislead than to aid the jury, and we find no error in the ruling as to it.

The other exceptions found in the record having been abandoned, it follows that the judgment appealed from must be affirmed.

*Judgment affirmed, with costs.*