SHRINER ET AL. *v.* MULLHAUSEN ET AL.

(Two Appeals In One Record.)

[No. 168, October Term, 1955.]

106

*Decided May 8, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Robert E. Clapp, Jr.* and *Ralph G. Hoffman* for appellants.

*Charles O. Fisher* and *D. Eugene Walsh,* with whom were *Walsh & Fisher* on the brief, for appellees.

COLLINS, J., delivered the opinion of the Court.

Here are two appeals in one record from judgments entered for the appellees, defendants, upon jury verdicts in each of two cases brought by the appellants, plaintiffs.

On January 5, 1953, Mrs. Pauline M. Shriner, one of the appellants, left her home in Woodboro, Frederick County, driving alone in the 1950 Buick automobile owned by her husband, Marlin L. Shriner, the other appellant, with the intention of going to Westminster for a twelve o'clock appointment at a beauty shop. She had had eighteen years' driving experience and had been driving this automobile since its purchase in 1950. As she was proceeding east along

the paved public road leading from Taneytown to Westminster, she approached a private dirt driveway leading to and belonging to the farm of Joseph H. Mullhausen, one of the appellees. This paved public road ran approximately east and west and, including the concrete shoulders, was twenty-one feet wide. The private dirt road was eighteen feet in width with an apron as it entered the paved public road approximately at right angles. At this intersection the paved public road on its north side had a nine foot dirt shoulder, along side of which was a concrete wall seventeen inches high in front of the lawn of the parsonage of Reverend Miles S. Reifsnyder. On the south side at this intersection the hard paved road had a dirt shoulder about six feet in width. From the farm entrance westward the public road rises to the crest of a hill. This distance, according to the actual measurement of Officer Boose, of the Maryland State Police, is two hundred and twenty-five feet. Going still further westward from the crest of this hill the road drops down grade for about nine hundred feet and then rises to the crest of a much higher hill, which crest was estimated by witnesses to be from thirteen hundred and twenty feet to twenty-one hundred feet west of the intersection.

About eleven o'clock that morning, the weather being clear and the road dry, Harold Edward Mullhausen, the other appellee, was driving his father's tractor, to which was attached a loaded manure spreader, north along his father's private dirt road. The overall length of the tractor and spreader was twenty-three feet eleven inches, the tractor being eight or nine feet in length. The tractor weighed about thirty-two hundred pounds and the loaded manure spreader about two tons. At or about the intersection of the private dirt road with the hard paved road, the automobile, operated by Mrs. Shriner, and the tractor, operated by Harold Mullhausen, collided.

As a result of that collision Mrs. Shriner, as plaintiff, on February 15, 1954, entered suit against the two Mullhausens for personal injuries arising out of the collision. On March 6, 1954, the Mullhausens filed the general issue plea to Mrs. Shriner's suit. Joseph H. Mullhausen also filed a

counter claim against Mrs. Shriner for damages to his tractor. Also on February 15, 1954, Mr. Shriner filed suit against both of the Mullhausens for loss of his wife's services, the expenses of her treatments, and for damages to his automobile. The cases were all tried together before a jury. Verdicts were rendered in favor of the Mullhausens in the suits against them by the Shriners, and judgments for costs were entered in those cases in favor of the Mullhausens. From those judgments the Shriners, appellants, appeal here. A verdict was also entered in favor of Mrs. Shriner on the counter claim against her by Joseph H. Mullhausen, and judgment for costs was rendered in her favor on that counter claim. No appeal is taken by Joseph H. Mullhausen from that judgment.

Mrs. Shriner testified that she was driving east on the hard paved road from Taneytown to Westminster around forty-five miles an hour. When she drove over the top of a hill she saw directly in front of her a tractor with a manure spreader attached, across the highway and blocking it. When she went over the hill the farm equipment was coming out of the dirt lane at an angle, the tractor being toward Taneytown. The tractor was about half way across the white line moving to her left. The manure spreader was across the east bound lane of travel. The rear of the spreader was on the dirt. The equipment was moving and directly in front of her as she came over the hill. The only thing for her to do was to jam the brakes as hard as possible. When she did this the car swerved to the left, she was thrown out of the car and she is not sure what happened after that. She thinks the back of the automobile hit the front part of the tractor. The driver was not knocked off the tractor, which was about half or three-quarters across the white line at the time of the collision. The manure spreader was across Mrs. Shriner's eastbound lane of travel. After the accident, when she got off the ground to her feet, she learned that the driver of the tractor was Harold Mullhausen. After the accident her nose was bleeding and she could not use her right arm. The right rear wheel of the automobile was damaged. The automobile caught fire near the radiator and was

almost a complete loss. She was not familiar with this particular intersection, although she knew there were quite a few lanes and driveways along that highway. She had never seen a vehicle come out of that particular driveway before.

Trooper Boose, of the Maryland State Police, said he arrived at the scene of the accident about 11:30 A. M. He measured the distance from the center of the private entrance to the crest of the hill to the west and the distance was two hundred and twenty-five feet. The grade was slight. The top of the second hill which is higher could be seen from the private driveway. He was not absolutely positive that the vehicles had not been moved before his arrival. The front of the tractor was struck by the right rear of the Buick, which struck the wall on the north side of the hard paved road opposite the intersection. The skid marks started on the right, the proper side of the road, and then appeared to go over at a slight angle gradually to the left toward the concrete wall, a distance of approximately one hundred and fifty feet. There was a break of approximately fifteen feet in those skid marks. He was not positive as to the length of this break. The entire front part of the car including the wheels went over the concrete wall and the car came to rest about fifty feet from the point of impact and against a pole. When he arrived the front part of the tractor was in the west lane of the hard paved road approximately ten feet to the west and northwest of the entrance of the private driveway and at a slight angle. The manure spreader was about three feet over the white line in the east lane. There was evidence that the farm equipment had been pushed back about two feet. About eight feet of the paved road and the six foot dirt shoulder was not blocked and east bound traffic was passing when he arrived. The weather was clear and the road was dry. The speed limit at the scene of the accident was fifty miles an hour. There was a broken white line allowing traffic toward Westminster to pass.

Trooper Hahn, also of the Maryland State Police, testified that he assisted Trooper Boose the day after the accident in making measurements. He said the measurement to the

crest of the first hill was two hundred and twenty-five feet from the center of the private driveway. He further said that sitting in a car in the center of the driveway one could see approximately three hundred feet west toward Taneytown. He estimated that the distance from the private driveway to the top of the second hill was from one quarter of a mile to seven hundred yards. The top of the second hill was visible from the private driveway.

Harold Edward Mullhausen, seventeen years of age at the time of the accident and twenty at the time of the trial, testified that he had been operating tractors since he was about twelve years old. He did not have an automobile driver's license at the time of the accident on January 5, 1953, but had since obtained one. He stated that on that day he traveled north out to the end of his father's lane, driving the tractor with the loaded manure spreader attached to the rear. As he came to the end of the lane, he stopped for one or two seconds, looked both ways, and could see the top of both hills to his left. He saw nothing coming, started out straight across the paved road toward Taneytown. The equipment was not moving fast. As he was going toward Taneytown the automobile came over the hill and started to skid. At that time the whole tractor was across the white line and blocking the westbound lane. He was making a turn to the left. The manure spreader was behind the tractor on the other side of the road and might have been blocking the eastbound lane. He held both brakes on the tractor. The automobile came sliding down "way across" the road. It hit the cement steps, jumped over the concrete wall, and its back end hit him. The automobile then swung around over the top of the minister's lawn and hit the telegraph pole. When he was struck he had gotten both pieces of equipment over in the westbound lane. The right wheel of the tractor was in the dirt and the left wheel was on the cement. Immediately after the accident the tractor was over in the dirt and about three feet of the back part of the manure spreader was on the white line. The equipment was pushed back three or four feet by the collision. The whole front end of the tractor was hit.

Joseph H. Mullhausen testified that the length of the equipment, tractor and manure spreader, was twenty-three feet eleven inches. He arrived at the scene of the accident about fifteen minutes after it happened. The tractor was then across the road, the front wheels a foot and a half to two feet on the dirt. The right rear wheel was also on the dirt. The left rear wheel was on the paved road at an angle. The kickers of the manure spreader might have been over the white line a foot to a foot and a half. The back wheels of the spreader were over the white line. The tractor could not be moved because the axle had been broken. Mrs. Shriner's car was against the electric pole up on the bank about seventy-five feet from the spreader, and about three hundred feet from the brow of the hill. According to his measurement it was three hundred feet from his private driveway to the crest of the hill. He measured this by the number of electric poles which were one hundred and fifty feet apart. When asked whether it was possible to see beyond the crest of the hill if one were sitting in a car, or on top of a tractor, he replied: "Yes. You can sit in a car—put a car in the driveway and sit in another car out in the road and it is about 410 feet you can see a car sitting in the driveway." He talked to Mrs. Shriner after the accident and she said when she came over the hill she slammed on her brakes, the car got out of control, she hit the tractor and that is all she remembered.

Dr. C. H. Kable, a veterinarian, testified that he was entering the paved highway, coming from Uniontown, about four hundred or five hundred yards above the point of the accident. He saw the same car which later collided with the tractor, go by him as he stopped before coming out on the paved road. He had been driving an automobile about thirty years. He was asked at that point what in his opinion was the rate of speed of Mrs. Shriner's car as she passed him. An objection was made to that question and overruled by the court. Dr. Kable answered: "Well, it would be kind of hard to judge the speed of a car from a sitting position, but I'd say it was the speed limit, or greater." We will assume, without deciding, for the purposes of this case that this

answer was admissible. *Acme Poultry Corp. v. Melville,* 188 Md. 365, 373, 53 A. 2d 1. This testimony could certainly not be construed to the effect that Mrs. Shriner was actually exceeding the speed limit.

Dr. Reifsnyder, the minister, testified that after the accident Mrs. Shriner was taken into his home. He said immediately after the accident the front part of the tractor was on the dirt on his side of the road. He thought the manure spreader was partly over the white line with some of its mechanism on the opposite side or east side of the road. Mrs. Shriner's automobile had jumped the wall and made marks on his lawn.

The primary question which arises is whether Mrs. Shriner's first prayer should have been granted. This prayer was as follows: "The Plaintiff, Pauline M. Shriner, moves for a directed verdict in her favor on the issue of her negligence on the ground that there is no evidence in this case legally sufficient to prove that she was guilty of any negligence causing or contributing to the accident and on the ground that the uncontradicted facts adduced in evidence establish the negligence of Harold Edward Mullhausen and that such negligence was the direct and proximate cause of the accident."

The appellees contend here that this was not an intersection collision but a "passing" case as *Ness v. Males,* 201 Md. 235, 93 A. 2d 541. With this contention we do not agree. In that case the evidence was undisputed that the driver of the automobile entering the through highway had completed his turn into it from the intersecting road and was traveling on his proper side of the highway immediately before the collision. Compare *Sun Cab Company v. Cusick,* 209 Md. 354, 121 A. 2d 188, and *Shaneybrook v. Blizzard,* 209 Md. 304, 121 A. 2d 218, where the same contention was made. Looking at the testimony here in a light most favorable to the appellees, Trooper Boose testified that when he arrived at the scene of the collision the tractor was in the west lane of the hard paved road approximately ten feet to the west and northwest of the entrance of the private driveway at a slight angle. The farm equipment being twenty-three feet

eleven inches in length, part of it necessarily must have been in the intersection when the collision occurred. The statutory obligation to yield the right of way at such an intersection imposed upon the unfavored driver extends to the entire passage across the favored highway. *Ness v. Males, supra.*

Code, 1951, Article 66½, Section 199, provides as follows: "(Entering Paved Public Highway From Unpaved or Private Road.) The operator of a vehicle entering a paved public highway, which is hereby defined to be a highway having a hard, smooth surface, composed of gravel, shells, crushed stone, paving blocks, asphalt, concrete or other similar substance, from an unpaved public highway, or from a private road or drive, shall come to a full stop upon reaching the intersection, and yield the right of way to all vehicles approaching on such paved public highway." Code, 1951, Article 66½, Section 198, provides in part: "(Vehicle Entering Through Highway or Stop Intersection.) (a) The driver of a vehicle shall come to a full stop as required by this Article at the entrance to a through highway and shall yield the right of way to other vehicles approaching on said through highway." Code, 1951, Article 66½, Section 207, gives to the State Roads Commission the power to designate through highways and erect stop signs at specified entrances thereto. Section (c) of that Section provides: "Every driver of a vehicle shall come to a full stop at such sign or at a clearly marked stop line before entering an intersection and yield the right of way to vehicles approaching on the intersecting highway except when directed to proceed by a peace officer or traffic control signal." Sections 198 and 207, *supra,* have been frequently referred to as the boulevard law.

The wording in Sections 198 and 207, *supra,* the boulevard statutes, are practically identical with the wording in Section 199, *supra.* The many decisions of this Court construing the boulevard statute have become a part of that statute and will continue to be so until changed by the Legislature. *Sonnenburg v. Monumental Tours,* 198 Md. 227, 233, 81 A. 2d 617. Section 199, *supra,* was adopted by the Legislature by Chapter 1007, Section 179, of the Acts of 1943, approved May 6, 1943. The Legislature, when it passed that Act, must have

known how this Court construed the boulevard statute in 1939 in *Greenfeld v. Hook,* 177 Md. 116, 8 A. 2d 888, 136 A. L. R. 1485, and subsequent cases such as *Pegelow v. Johnson,* 177 Md. 345, 350, 351, 9 A. 2d 645; *Madge v. Fabrizio,* 179 Md. 517, 520, 521, 20 A. 2d 172; *Rinehart v. Risling,* 180 Md. 668, 674, 675, 26 A. 2d 411. Statutes applicable to motor vehicles are the responsibility of the Legislature and not of the courts. As frequently pointed out by this Court, where the Legislature has acquiesced in the judicial construction of a statute, there is a strong presumption that the intention of the Legislature and the words used by it have been correctly interpreted, and as said in *Nutwell v. Supervisors of Elections,* 205 Md. 338, 343, 108 A. 2d 149: "* * * such an interpretation 'ought not to be disregarded but upon the most imperious grounds'. *Hess v. Westminster Savings Bank,* 134 Md. 125, 132, 106 A. 263; *Wells v. Price,* 183 Md. 443, 456, 37 A. 2d 888; *Dept. of Tidewater Fisheries, et al. v. Sollers, et al.,* 201 Md. 603, 615, 95 A. 2d 306, and cases there cited." Therefore, we must give the same interpretation to Section 199, *supra,* as has been given by this Court to Sections 198 and 207, *supra,* the boulevard statutes.

Judge Markell, in *Sonnenburg v. Monumental Tours, supra,* decided June 15, 1951, reviewed the so-called boulevard law, and said in that case: "The boulevard law (now Art. 66½, secs. 178, 187) originated in Chapter 224 of the Acts of 1929. Decisions of this court construing the statute become part of the statute and continue to be so unless and until changed by statute. *Greenfeld v. Hook,* 177 Md. 116, 8 A. 2d 888, 136 A. L. R. 1485, was decided almost twelve years ago. It was a suit by an unfavored driver against the favored driver. Notwithstanding the plaintiff's contributory negligence this court found sufficient evidence to go to the jury on the last clear chance theory. The court, saying it was considering 'the relative rights of travelers' on a boulevard and an intersecting highway (*Shedlock v. Marshall,* 186 Md. 218, 232, 46 A. 2d 349) stated the near-absolute right of way of the favored driver, his right to assume that the unfavored driver will both stop and yield the right of way and

to 'exercise the privilege of uninterrupted travel' without stopping or slowing down to bring his car into control. *Greenfeld v. Hook* has repeatedly been quoted in later cases. Little has been added to what was then said regarding 'the relative rights of travelers', but much has been done in expanding the scope and application of what was then said to persons in other relations. In *Clautice v. Murphy,* 180 Md. 558, 563, 26 A. 2d 406, 408, the court said, 'The driver of the taxicab was, of course, under the duty to recognize that drivers from the left will often cross negligently, miscalculating the chances of collision. *United Railways & Electric Co. v. State,* 163 Md. 313, 325, 163 A. 90; *United Railways & Electric Co. v. Crain,* 123 Md. 332, 91 A. 405; *Lange v. Affleck,* 160 Md. 695, 155 A. 150, 79 A. L. R. 1274; *Pennsylvania Steel Co. v. Wilkinson,* 107 Md. 574, 581, 69 A. 412, 16 L. R. A. (N. S.) 200; *72 Univ. of Pa. Law Review,* 211, 343; *Torts, Restatement,* Sec. 449; *Warner v. Markoe, supra.'* *Clautice v. Murphy* was not a boulevard case. The driver of a taxicab or any other driver is not under a duty to anticipate, in the absence of evidence, that other drivers will often—or ever—cross negligently in violation of the boulevard law. The favored driver on a boulevard is not his brother's keeper. In *Belle Isle Cab Co. v. Pruitt,* 187 Md. 174, 179-181, 49 A. 2d 537, 539, a suit by a passenger against a taxicab company, the court, after quoting at length from *Greenfeld v. Hook,* said, 'In the Greenfeld case, however, the court found evidence to permit the case to go to the jury on the theory of last clear chance. And in other passages in that opinion the court recognized that the driver on the favored highway does not have an absolute right to proceed under all circumstances. See also the comment on this case in 4 Md. L. R. 207, 213. The recitals in Section 1 of Article 66½ of the Code, as codified, would seem to negative any implication that the statute was designed to change the established law of negligence so as to relieve the favored driver of all duty to use care. But in determining due care, the assumption that the unfavored driver will stop and yield the right of way is an important factor.' *Greenfeld v. Hook* is the last case in which this

court has found circumstances under which the favored driver had not the right to proceed or had failed in any duty to use care. Meanwhile the 'relative rights of travelers' have become the measure of the relative rights of favored drivers and victims of unfavored drivers, including passengers of the favored drivers (*Belle Isle Cab Co. v. Pruitt, supra; Baltimore Transit Co. v. O'Donovan,* 197 Md. 274, 78 A. 2d 647) and strangers not guilty of contributory negligence or chargeable with the unfavored drivers' negligence. *Brooks v. Childress,* 198 Md. 1, 81 A. 2d 47. The statement in *Greenfeld v. Hook,* following in this respect *Blinder v. Monaghan,* 171 Md. 77, 188 A. 31, that 'the obvious and essential purpose' of the statute 'is to accelerate the flow of traffic on through highways' was quoted in *Belle Isle Cab Co. v. Pruitt* [187 Md. 174, 49 A. 2d 537]. In the latest case in this court this was said to be 'the primary purpose of the statute'. *Brooks v. Childress, supra.*"

Looking at the evidence in a light most favorable to the Mullhausens, appellees, the jury must have found that when Harold Mullhausen arrived at the intersection of the paved public highway with the unpaved private road, Mrs. Shriner's automobile was in the depression between the two hills west of that intersection. She had not reached the top of the hill nearest the intersection because Harold Mullhausen did not see her. When she had a view of the farm equipment the tractor was across the white line of the twenty-one foot paved road and was blocking the westbound lane of that road. The remainder of the equipment, fourteen feet eleven inches in length, was on the east side, her side, of the twenty-one foot paved road. There is no testimony that she was exceeding the speed limit. In *Rinehart v. Risling, supra,* the unfavored driver testified that he could see one hundred yards down the favored highway and saw nothing before entering the favored highway. The driver of the truck on the favored highway in the collision was held not guilty of negligence as a matter of law. In *Shedlock v. Marshall, supra,* the favored driver saw the unfavored vehicle two hundred and fifty to three hundred feet from the intersection, when the unfavored driver drove suddenly in front of him. The

favored driver, in an effort to avoid a collision, went over the curb and turned over. It was there held that there was no evidence that the favored driver had the last clear chance to avoid the collision, and that he was entitled to a directed verdict. In *State v. Gosnell,* 197 Md. 381, 79 A. 2d 530, the motorist on the unfavored highway, even though he had observed the lights of two cars which were allegedly racing two-tenths of a mile away, drove slowly across the favored highway. It was there held that, although the vehicles on the favored highway were racing and traveling at an unlawful speed, the unfavored driver was guilty of contributory negligence and could not recover; that the favored driver had the right to assume that the unfavored vehicle would comply with the boulevard statute, and that the doctrine of last clear chance did not apply. In *Brooks v. Childress, supra,* where a verdict was instructed for the driver of the tractor-trailer, that tractor-trailer was two-tenths of a mile from the intersection when the unfavored vehicle entered the favored highway. It therefore plainly appears from the boulevard cases that Harold Mullhausen was guilty of negligence as a matter of law in pulling this heavy and slow moving farm equipment on the paved highway and not yielding the right of way when Mrs. Shriner's car was evidently in the depression between the two hills. If he had waited a few moments longer to give any approaching vehicle the time to clear that depression, the accident here would not have happened.

The remaining question is whether Mrs. Shriner was guilty of contributory negligence or negligence under the last clear chance doctrine. In the case of *Burhans v. Burhans,* 159 Md. 370, 150 A. 795, the driver of an automobile put on the brakes so hard, to avoid a collision with a large dog coming from a side road, that it caused the car to skid and the accident to occur. This Court said in that case at page 376: "There is certainly nothing in this evidence to show that she was negligent in attempting to avoid a collision with the dog, nor is it shown, we think, that she did anything in her attempt to avoid a collision with the dog that an ordinarily prudent person would not have done when suddenly placed in such perilous situation. Had she not attempted to

avoid striking the dog, the consequences of hitting or running over it might have been even more disastrous than those following the course she pursued."

In *Coastal Tank Lines v. Carroll*, 205 Md. 137, 106 A. 2d 98, a tractor-trailer, the property of the appellant, was traveling on a boulevard following a stake body truck. There was no evidence of speed that rose above speculation. An automobile suddenly entered the boulevard from a side road. The stake body truck struck the automobile and the driver of the Coastal Tank Lines' tractor-trailer cut to the right and hit a curb which threw it into a pole. The pole was snapped off at its base and the tractor-trailer ran into the corner of a house. As to the driver of the stake body truck, this Court held that he was not negligent because he was not required to anticipate that the automobile driver would ignore the boulevard law and suddenly cut in front of him at the intersection. The automobile driver alone was held responsible for the collision between it and the stake body truck. In reference to the negligence of the driver of the tractor-trailer, this Court there said: "He had the alternative of striking the convertible and perhaps injuring or killing the passengers or attempting to avoid it. He chose the latter and swung to the right where there was a three or four foot asphalt gutter, in an effort to pass. His plan did not succeed because the curb caused the tractor-trailer to rock and go out of control. Perhaps perfection in anticipation, reactions and actions could have devised a means whereby the accident would have been avoided, but the driver of the Coastal vehicle is not to be tested by such a standard, but rather by what an ordinary man would do under the same circumstances. We think that the driver's actions, in the face of this sudden emergency, which he was not bound to anticipate, were comparable, in effect, to those of the driver in *Burhans v. Burhans*, 159 Md. 370, 150 A. 795, where no liability was imposed, and that the steps he took were reasonable under the circumstances to avoid the danger presented. Even as in the case of the stake body truck, the proximate cause of the injury, as far as the Coastal tractor-trailer was con-

cerned, was the action of the convertible in blocking the highway in violation of the boulevard law."

Certainly the natural thing for Mrs. Shriner to do, and what any reasonable person would have done was to apply the brakes. She could not see the condition of the six foot dirt shoulder at the intersection. There is no evidence that the brakes on the automobile were defective. There is no evidence as to within what distance she could have stopped her automobile. Dr. Kable's testimony is hardly to the effect that she was going greater than the speed limit. There was no reason for her to anticipate that this heavy, slow moving farm equipment would come on the highway when the views of the driver and herself were restricted. She did not know that there was a private intersection there. She had the right to believe that any vehicle coming on the highway from a private road would yield the right of way to her.

We are therefore of opinion that there was not sufficient evidence to show that Mrs. Shriner was guilty of negligence, that the appellees were guilty of negligence, and that verdicts should have been instructed in favor of the appellants and against the appellees. *Richardson v. Boato,* 207 Md. 301, 114 A. 2d 49; *Garozynski v. Daniel,* 190 Md. 1, 57 A. 2d 339; *Goldman v. Johnson Motor Lines,* 192 Md. 24, 63 A. 2d 622.

The judgments will therefore be reversed, and the cases remanded for the purpose of determining the amount of damages.

> *Judgments reversed, with costs, and cases remanded for further proceedings, in conformity with this opinion.*

HAMMOND, J., filed the following dissenting opinion.

The Court has applied the statute requiring one coming from an unpaved or private road or driveway onto a paved public highway to stop and yield the right of way to all vehicles "approaching" on the paved public road as if it imposed exactly the same obligations and granted the same privileges as does the boulevard stop law, both as to the unfavored and the favored driver. The majority opinion trans-

plants into the private road statute all of the heavy gloss that has been put, case by case, upon the words of the boulevard stop law.

The boulevard law was designed to accelerate and keep moving uninterruptedly the flow of traffic on main, heavily travelled arteries. Much of the language relied on in the present case was said originally in cases involving flat, straight twin ribbons of concrete, which, as to civil liability, have been made in effect legalized raceways on which the favored driver may rely almost absolutely on the presumption that no one approaching the boulevard will enter it. To apply this concept—particularly as far as the favored driver is concerned —to the shell roads of the tidewater counties (the private road statute specifically includes shell roads) and the uphill and down dale winding country roads of Garrett County or Carroll County, on which the ordinary right of way rules apply as to intersecting public roads, I think is both unwarranted and unfortunate.

The instant case would seem to be typically one where the jury should have been allowed to decide the negligence of both drivers. The result of the opinion of the majority is to make one entering a paved highway from a private road guilty of negligence as a matter of law if he fails to yield the right of way to an approaching vehicle although he cannot see it and although he could reasonably anticipate that if a vehicle is approaching, it would be able to avoid contact with him if it were within the control of its operator. Thus the word "approaching" in the statute is given an extended meaning for which I see no justification. As the Supreme Court of Wisconsin, in interpreting a statute entirely similar to the Maryland statute, said in *Heinecke v. Hardware Mut. Cas. Co.*, 58 N. W. 2d 442: "If applied literally, the above statute would lead to absurd results. No driver could enter a public highway from a private driveway if another car was approaching. The statute does not limit the term 'vehicles approaching' to those in sight." In *Ness v. Males*, 201 Md. 235, the unfavored driver entered a boulevard at a point where the visibility to the left, because of a hill and curve, was only two hundred feet. Judge Henderson, in speaking

of the unfavored driver, said for the Court: "* * * he could hardly be held negligent in entering and making the turn when the way was clear as far as he could see. The obligation to yield the right of way could hardly demand that he remain there permanently or enter at his peril." In the present case, under the testimony most favorable to the driver of the tractor, he could see a distance of some four hundred feet—concededly three hundred feet—as he entered the public road. When he did so there was nothing in sight and nothing came into view until he was half way across. The majority argued that he should have watched the further hill to see if traffic was approaching the nearer crest. This ignores the difficulty of estimating how long a car already hidden would remain hidden, as well as the significant fact that a car might enter the road from a hidden intersecting road. One of the witnesses, Dr. Kable, did exactly this. I think the question of the negligence of the tractor driver was for the jury.

Particularly does it seem to me that the negligence of the driver of the automobile, Mrs. Shriner, is a question for the jury. The Court holds that when she saw the tractor and manure spreader going across and up the road when she was some three hundred to four hundred feet away, she was confronted with an emergency that was legal justification for everything she did or failed to do thereafter. She was as far away from the tractor and manure spreader when first she saw, or should have seen, it as an average, or long, city block, depending on which estimate of distance is believed. To me it borders on the fantastic to say that a driver of a car going forty-five miles an hour—her own estimate of her speed—cannot stop in the length of a city block, or that he is excused from stopping because he bungles the attempt when he has ample opportunity to do so. The effect of the holding of the majority is that one who rounds a corner or comes over a hill and sees a red light a block away, may be permitted to go into a panic and lose control of his car without legal liability. Suppose, for example, that the private road in this case had been an intersecting public road and the exact factual situation had been present as was

present here. What possible justification could there be for holding that Mrs. Shriner was not obligated to be able to stop within a block from the intersection of the public highways occupied by another vehicle. On the day of the accident the road was dry. Visibility was good. The downgrade was described as slight. The pamphlet published by the Department of Motor Vehicles containing the Motor Vehicle Laws of Maryland, 1955 edition, gives a table of speed and stopping distances prepared by the National Bureau of Standards, which shows that at a speed of forty-five miles an hour under favorable conditions, the reaction time is 33 feet, the braking distance is 135 feet, and the aggregate stopping distance is 168 feet. Similar calculations have been made, using reaction times from the slowest to the speediest, and the shortest stopping distance at forty-five miles an hour is 129 feet, and the greatest is 179 feet. The evidence is uncontradicted that by the time Mrs. Shriner hit the tractor (after laying down skid marks one hundred and fifty feet long and jumping a wall), her lane of the roadway was open so that she easily could have passed to the right of the rear of the manure spreader. Even after she had knocked the manure spreader back two feet, it was still only three feet over on her side of the road. The paved road was twenty-one feet wide—her half was ten and a half feet—and in addition, there was a six foot dirt shoulder on her side so that prior to the collision, there were fifteen and a half feet of roadway on her side on which to pass. The majority opinion says that "she could not see the condition of the six foot shoulder at the intersection". Presumably the six foot shoulder at the intersection was the same as it was all along the roadway, and if her eyesight justified the granting of a driver's license there would seem to have been nothing whatever to have kept her from seeing the condition of the shoulder. It is clear to me that the jury could have found that had Mrs. Shriner had her car under control and had she not gone into a panic and lost control, either she could have come to a complete stop or have slowed down and passed to the right of the manure spreader. There was testimony that Mrs. Shriner herself, immediately after the accident, said that

when she came over the hill, the car went out of control and she hit the tractor, and that is all she remembered. That statement should be sufficient to take the question of her negligence to the jury. *Coastal Tank Lines v. Carroll*, 205 Md. 137, relied on in the majority opinion, is completely distinguishable. There, there was a real emergency, not one largely in the mind of the driver as in the case before us. There the accident followed the sudden entry into a boulevard of an automobile "* * * which collided with a stake body truck proceeding down the Highway just ahead of the tractor-trailer." There, "The driver of the Coastal truck said that he attempted to go over the curb because there was not room left in the road proper to pass the convertible." As this happened, the Coastal truck was only twenty-five or fifty feet behind the stake body truck. "The driver could not pass to the left of the convertible, * * *. He had the alternative of striking the convertible and perhaps injuring or killing the passengers or attempting to avoid it." He did all that anyone could reasonably have done under the circumstances and failed in his attempt to clear the vehicle ahead because the striking of the curb caused his truck to go out of control. There is no comparison between the real need there for sudden action and the situation in the case before us, where there was ample time to make an orderly stop or an orderly passage by the obstructing vehicle.

In granting the favored driver on an ordinary public highway the same privileges and immunities, in relation to one coming from a private road, as a driver on a boulevard has in relation to drivers entering the boulevard, the majority of the Court decides that Mrs. Shriner was not speeding and that even if she were, it would not affect her liability. It seems to me that there was evidence from which the jury could have found that she was speeding. Dr. Kable testified that she was going the speed limit, *or better*. This statement, coupled with the fact that she laid down skid marks on all four wheels for a distance of one hundred fifty feet, and even after that reduction of speed, was going fast enough to climb a wall, break the axle of a heavy tractor and knock it and the manure spreader back two feet, is enough to per-

mit a finding of excessive speed. The holdings in the boulevard cases that the speed of the favored driver is not the proximate cause of accidents occurring when the boulevard is invaded by an unfavored driver, are all predicated on the principle that the favored driver must use due care, but that an element of due care in such a situation is the right to assume that one will not enter a boulevard when traffic is approaching. As has been said time and again, the assumption that the unfavored driver will stop and yield the right of way is an important measure of whether due care was exercised. Even in the boulevard cases—as certainly should be the rule in the present case—when it becomes obvious that the unfavored driver has not stopped and yielded the right of way, but actually is in the intersection in time for the favored driver to stop or otherwise avoid him, the question of the negligence of the favored driver is a jury matter. *Greenfeld v. Hook*, 177 Md. 116; *Sun Cab, Inc. v. Hall*, 199 Md. 461. In the instant case, when Mrs. Shriner came over the hill an average, or long, block away from the intersection, the tractor and manure spreader were well across the road. No presumption that the favored road would not be invaded could be relied on, for the favored road had already been invaded. At that point Mrs. Shriner could not know whether the invasion had come from a private road or another public road. The sole question to be decided is whether Mrs. Shriner was far enough away to stop if her car were being operated under reasonable control. The effect of the majority holding is that a driver on an ordinary country road can speed with impunity even though he has no right to assume, as far as the intersecting public roads are concerned, that no one will enter the road on which he is driving. Mrs. Shriner testified that she was familiar with the road, that she knew there were many private roads and driveways entering upon it and of course she knew she was coming up over a hill. In *Ness v. Males, supra,* Judge Henderson said for the Court in a situation that is similar, that the jury properly might have found the favored driver was at fault "* * * not for relying upon his right of way, but for driving at high speed over a hill and around a curve

where he knew the visibility was limited * * *." I think that it was wrong, both legally and factually, to treat the case before us as if it had happened on a boulevard and to make the boulevard law apply in all aspects to ordinary roads merely because the accident occurred near a private driveway. Even under this standard, the facts of the case before us would make Mrs. Shriner's negligence a jury question on the authority of *Sun Cab, Inc. v. Hall, supra*. There the invasion occurred when the favored driver was a third of a block away. Here the invader was well across the intersection when the favored driver was a block away. I would remand the case for a new trial on proper instructions to the jury.